[Nos. S004778, S012228. Crim. No. 26412. Nov. 30, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE DARNELL JOHNSON, Defendant and Appellant.

1184

1186

1194

**COUNSEL**

Marianne D. Bachers, Richard C. Neuhoff, Lynn S. Coffin, Susan K. Alexander, Joseph Schlesinger, Denise E. Anton and Janice L. Bergmann, under appointments by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, John H. Sugiyama, Assistant Attorney General, Herbert F. Wilkinson, Dane R. Gillette, Morris Beatus and Donna B. Chew, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**PANELLI, J.**—A jury convicted Willie Darnell Johnson of the murder of Mrs. Willie Womble (Pen. Code, § 187),[1] the attempted murder of Ms. Angela Womble (§§ 187, 664), robbery in an inhabited dwelling (former § 213.5; see now § 212.5), and first degree burglary (§§ 459, 460). Robbery and burglary felony-murder special-circumstance allegations were found true. (§ 190.2, subd. (a)(17)(i), (vii).) The jury also found that defendant personally used a firearm in the commission of these offenses (§ 12022.5) and inflicted great bodily injury in the commission of the attempted murder, the robbery, and the burglary (§ 12022.7). Following a penalty trial, the jury sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety.

We dismiss defendant's related appeal from a postjudgment order of the trial court (No. 12228).

### GUILT PHASE FACTS

#### A. *Prosecution Case*

On July 1, 1986, Angela Womble lived with her mother, Mrs. Willie Womble, and her 16-month-old son, Terrance (Tee Tee), at 111 South 42nd Street in Richmond. Tee Tee's father was Angela's former boyfriend, Terrance (Tee) Henderson. Henderson was reputed to be a drug dealer.

While Angela was Henderson's girlfriend, she had held sums of money for him. After their relationship ended in August 1984, she never held money for him.

Angela cashed a paycheck from her job at the Social Security Administration on July 1, 1986. That evening, she set aside cash to pay bills, placing the appropriate amounts in payment envelopes which she put on a curio shelf in her kitchen.

About 9:45 or 10 p.m., Angela heard a knock at the front door. Her mother was talking on the telephone, and Angela went to the door to ask who was there. She heard someone answer, "Ann, this is Allie. Come take me to the gas station." Angela again asked, "Who?" The man repeated himself. She recognized the voice as that of Allen Duchine, a friend of Terrance Henderson.

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

Angela took the chain off the door and opened it. On her front porch were Duchine and another man whom she did not know. They were both carrying guns. She tried to close the door, but they pushed it in. The impact from the door knocked her onto the living room floor. Duchine entered, followed by the other man.

Angela sat on the floor for one or two minutes, looking at the men. At trial, she described the lighting conditions in her house at that moment. Although the porch light was off, lights were on in the breakfast nook outside the kitchen and in the bathroom. There was also a street light between the Womble house and the next house to the north. She did not remember whether lights in the kitchen or the living room were turned on.

At trial, Angela described Duchine as wearing jeans, a baseball cap, and a dark-colored jacket. Duchine was carrying a rifle about 22½ inches in length. The other man, whom she later identified as defendant, was wearing a white T-shirt and jacket and a shiny stud earring. He was carrying a shotgun about 20 inches in length. The barrel of Duchine's rifle was about the size of a dime; that of defendant's shotgun about the size of a 50-cent piece.

After Angela was knocked to the ground, her mother ran to the living room and began to hit defendant, trying to force him to let go of his gun and demanding that he get out of her house. He pushed Mrs. Womble to the ground with his gun. Angela told her mother to stop and sit down.

Duchine demanded that Angela give him her money. She got up and went to the curio shelf, took the money out of the payment envelopes, and handed it to Duchine. Mrs. Womble remained on the living room floor with defendant standing over her.

Angela returned to the living room and sat down. She was able to see defendant clearly. Duchine ordered her to give him all the money. Angela told him she had given him what she had, but Duchine demanded, "Where's Tee's money?" Angela said she did not have Tee's money. Duchine accused her of lying and again asked where the money was.

Angela, carrying Tee Tee, and Duchine went to Angela's mother's bedroom. Duchine rummaged through the room, looking for money. Angela left the bedroom to return to the living room. Duchine followed her. In the hallway outside the bedroom, he raised the stock of his rifle and knocked the cover from the hole leading to the attic.

Twenty seconds to a minute after Angela returned to the living room, Duchine also returned. Angela did not see where he had gone in the interim,

but later she discovered that various items in her bedroom had been moved. Duchine and defendant spoke to each other, but Angela could not hear what they said.

Defendant pumped the shotgun and fired it into the ceiling. Angela urged her mother to lie down. Defendant again fired up at the ceiling, then pointed his weapon down and fired into the back of Mrs. Womble's head. Angela testified that he fired a second time at Mrs. Womble.[2]

Defendant and Duchine then pointed their weapons at Angela, who also had lain down on the floor. She tried to duck, and felt she had been shot. Ten or fifteen seconds later, defendant and Duchine left the house, closing the front door behind them.

Angela crawled to the front door, but could not open it. Tee Tee pulled the door open for her, and Angela screamed for help. Several neighbors responded. Angela told one of her neighbors she had been shot by Duchine and another man. A police officer arrived and asked Angela who had shot her. She named Duchine and described him, and said she did not know the other man, but gave a brief description of him.

Various neighbors of the Wombles testified to their observations on the night of the crimes. Willa Mae Addison, whose house faced the Womble residence, testified that while talking with her daughter on the telephone on the evening of July 1, 1986, she heard two sounds that she initially thought were firecrackers going off. Then she heard a third sound. Dropping the telephone, she looked out her bedroom window and saw two men emerging from the Womble residence. They ran along the side of the house into an alley, got into a white or cream-colored pickup truck, and drove away.

On hearing the telephone drop, Ms. Addison's daughter, Willie Marie Juniel, drove to her mother's house. Hearing Angela's cries for help, she stopped at the Womble residence to aid her. Ms. Juniel testified that there was sufficient light to enable her to see furniture in the living room. Darlyne Robinson, who also attempted to assist Angela, testified it was light enough in the Womble living room for her to see Tee Tee, who was standing beside the north wall, crying.

Richmond Police Officers deVille and Martin arrived at the Womble house about 10:10 p.m. According to Officer deVille, the living room was well lit and he had no difficulty seeing items inside it. Officers Simmons and Imrie arrived at the Womble residence soon after deVille and Martin. Angela told

---

[2]An autopsy revealed, however, that Mrs. Womble had suffered a single gunshot wound.

them what had happened, describing both gunmen as Black, in their 20's, 6 feet tall, with black hair. She said she could identify them if she saw them.

Inside the house, Officers Simmons and Imrie could see well enough to make observations without using a flashlight or additional lighting. They found physical evidence including three expended shotgun shell casings beside Mrs. Womble's foot, bullet holes in the north wall and ceiling, and bloodstains on the northeast curtain of the living room.

Evidence showed that defendant and Duchine were together on the day of the crimes. Ketcia Hawkins, a friend of Angela Womble who was acquainted with defendant and Duchine, testified she saw the two men between 5 and 6 p.m. in the Easter Hill neighborhood in Richmond. Later that night, Hawkins received a telephone call from Angela's cousin, Bobby Jones, who told her about the crime. Between 10:30 and 11 p.m., Hawkins in turn called Zina Sims, defendant's cousin. Hawkins testified that while Hawkins remained on the line Sims dialed another party, using three-way calling. Hawkins recognized the third party's voice as that of Renee Morgan, defendant's sister. After Hawkins spoke with Morgan, Duchine came on the line. While Duchine was on the line, defendant also came on the line.

Zina Sims testified she received a telephone call from Ketcia Hawkins between 10 and 10:30 p.m. but denied placing any calls while Hawkins was on the line. Nonetheless, she testified that after talking with Hawkins, she called defendant's mother's house and spoke briefly with defendant's sister Renee Morgan. Later, Renee telephoned Sims. Both defendant and Duchine spoke with Sims during the latter call.

Richmond Detective Michael Shipp went to the house of defendant's mother, Valine Duckett, about 6 p.m. on July 2. He saw a tan pickup truck parked on the property. The truck was registered to Ms. Duckett.

Later on the evening of July 2, Detective Shipp interviewed Angela Womble at John Muir Hospital. She had difficulty breathing and was connected to an oxygen machine. Detective Shipp showed Angela two photographic lineups, each consisting of six photographs. In the first lineup, Angela positively identified Duchine's photograph. In the second, Angela identified defendant's photograph, saying she was not positive, but he looked like the person who shot her mother. Angela stated that friends and relatives had told her Duchine's accomplice was "Willie Johnson." She described him as dark-skinned, with a round head, a short haircut, and an earring in one ear. Detective Shipp tape-recorded Angela's July 2 interview, which was generally consistent with her testimony.

On July 7, Detective Shipp spoke to Angela about the shooting over the telephone. During this interview, which Shipp tape-recorded, Angela described the second perpetrator as "the tall, dark man" and "the larger dude." She said he looked like he was wearing a white T-shirt, but she was unsure. He wore an earring in his right ear, she said.

On July 17, Detective Shipp learned that defendant was in custody in Martinez. The following day, he arranged for Angela Womble to view a live lineup. Counsel was appointed to represent defendant at the lineup. Defendant was advised he did not have a right to refuse to participate in a lineup and his refusal could be used in evidence against him. Nonetheless, defendant refused to participate.

On July 22, Detective Shipp showed Angela another photographic lineup that included a picture of defendant taken more recently than the one shown her on July 2. This time she positively identified defendant's photograph.

Physical evidence was in most respects consistent with Angela's testimony. Bruce Fukayama, a criminalist, testified that he examined the shotgun shell casings, pellets, and wadding found at the scene and the lead projectile fragment removed from Angela's arm. He concluded that the lead fragment was from a bullet rather than a shotgun shell.[3] Dr. Louis E. Daugherty performed an autopsy on the body of Mrs. Womble. He testified she died of a shotgun wound to the head. Evidence indicated that four shotgun rounds in all had been fired.

No physical evidence linked defendant with the crime.

B. *Defense Case*

The defense was misidentification. Dr. Elizabeth Loftus, a professor of psychology, testified about factors affecting human perception, memory, and identification. She testified that there are three stages of memory: acquisition, retention, and retrieval. An evaluation of a witness's acquisition of a visual memory must consider lighting conditions, distance of the witness from the object seen, and the witness's level of stress or fright. Under high

---

[3]Fukayama's initial examination of the expended shells led him to testify, at the preliminary hearing, that one of the shells (the "Remington Peters" shell) had been fired from a different shotgun than the others (the "Charles Daly" shells). However, he had come to that conclusion without considering and researching the fact that the bases and primers of the two types of shotgun shells were made of different metals. On reexamination of the shell casings, Fukayama testified he could neither confirm nor rule out the possibility that the Remington Peters and Charles Daly shells were fired from the same shotgun but he opined that all of the shells had at some time been chambered in the same shotgun.

levels of stress or fright, she testified, the ability to perceive and remember may be significantly impaired.

Dr. Loftus described a phenomenon known as "weapon focus": when a crime involving a weapon occurs, the weapon's presence can capture a great deal of the witness's attention, which can lead to reduced ability to remember and accurately describe other details.

Dr. Loftus noted there is a tendency for a witness to overestimate the duration of relatively short events, especially complex ones, and women tend to overestimate more than do men.

According to the witness, when it comes to retention of memory, the longer the interval of time that passes before the witness tries to recall information from memory, the less accurate the memory. Moreover, what occurs in the retention interval is crucial: if the witness is exposed to new, suggestive, or confirming information about the event, the greater the potential for contamination of the witness's memory.

Dr. Loftus testified that studies have demonstrated there is little or no correlation between the witness's confidence in his or her memory, and its accuracy.

### JURY SELECTION ISSUES

#### A. *Denial of Defense Challenges for Cause to Three Prospective Jurors*

During jury selection, defendant challenged three prospective jurors for cause. The trial court denied the challenges, and defendant later used peremptory challenges to prevent those persons from serving on the jury. When the jury was finally seated, defendant had five peremptory challenges remaining. ■ He now urges that denial of his challenges for cause was reversible error under the federal and state Constitutions and former section 1073. (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 423-424 [83 L.Ed.2d 841, 851, 105 S.Ct. 844]; U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 1, 7(a), 15, 16; see also former § 1073, repealed by Stats. 1988, ch. 1245, § 33, p. 4155.)

In order to obtain relief on appeal for denial of a challenge for cause, defendant must show that the ruling affected his right to a fair and impartial jury. Because defendant exercised peremptory challenges to remove the three prospective jurors whom he had unsuccessfully challenged for cause, none of the three compromised the impartiality of his jury. Therefore, he

cannot claim error under *Wainwright v. Witt, supra,* 469 U.S. 412, based on the trial court's denial of those challenges for cause. (*People v. Mason* (1991) 52 Cal.3d 909, 954 [277 Cal.Rptr. 166, 802 P.2d 950]; see *Ross v. Oklahoma* (1988) 487 U.S. 81, 87-89 [101 L.Ed.2d 80, 89-90, 108 S.Ct. 2273].)

Defendant argues that the loss of the peremptory challenges he used to excuse the three prospective jurors prejudiced him. We cannot agree. Defendant had five peremptory challenges remaining when he accepted the jury. He expressed no dissatisfaction with the jurors selected and did not request additional peremptories. (See *People v. Bittaker* (1989) 48 Cal.3d 1046, 1088 [259 Cal.Rptr. 630, 774 P.2d 659].) Defendant's belated recitation of dissatisfaction with the jury is speculative. Consequently, he fails to demonstrate that he was harmed by the denial of his challenges for cause. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1247-1248 [270 Cal.Rptr. 451, 792 P.2d 251].)

■ Defendant contends he was justified in not exhausting his peremptory challenges due to the method of jury selection employed in his case. The parties stipulated to the use of the "struck system" instead of the more standard "jury box" method. Under the version of the struck system used in this case, prospective jurors filled out questionnaires and were individually questioned and challenged for cause. Next, prospective jurors were randomly assigned numbers establishing the order in which they would be further questioned and called to sit as jurors. They then were questioned in groups of 16 and subjected to challenges for cause. Finally, the remaining prospective jurors were seated in the jury box in the previously assigned order and the parties exercised their peremptory challenges. A prospective juror who was excused was then replaced with the next person on the list. Thus, based on earlier voir dire the parties were familiar with the attitudes of each member of the panel when they were called upon to exercise their peremptory challenges.

Defendant contends he should not have been required to exhaust his peremptory challenges because he knew, when the 12th juror was chosen, that there were at least 5 remaining people on the panel who were objectionable to him. He does not persuade us. Whichever method of jury selection is used, exhaustion of peremptory challenges is a prerequisite to a claim of error in the denial of a challenge for cause. (*People v. Morris* (1991) 53 Cal.3d 152, 185 [279 Cal.Rptr. 720, 807 P.2d 949] (*Morris*).) The difference between the struck and jury box systems bears no relationship to the requirement that a defendant exercise peremptory challenges to exclude jurors he believes to be biased against him. "Regardless of the system of jury

selection, a party's failure to exercise available peremptory challenges indicates relative satisfaction with the unchallenged jurors. Having so indicated in this case, defendant cannot reasonably claim error." (*Ibid.*; see also *People v. Ashmus* (1991) 54 Cal.3d 932, 964-967 [2 Cal.Rptr.2d 112, 820 P.2d 214] (*Ashmus*).) Defendant criticizes *Morris* and *Ashmus*, and cites decisions to the contrary from other jurisdictions, but does not persuade us that we erred.

Defendant also contends *Morris* and *Ashmus* are factually distinguishable from this case. In essence, he argues he had fewer peremptory challenges remaining and so was more disadvantaged vis-à-vis the prosecution than the defendant in either of those cases. He cites no authority for the point, and we assign it no weight.

Defendant also makes much of the fact that he exercised all four of the peremptory challenges allotted him in the selection of the four alternate jurors. As defendant sees it, this—together with the fact that one prospective juror whom defendant had unsuccessfully challenged for cause was third in line to be summoned to the jury box after the alternates were sworn—meant that defendant knew he would be unable to improve the composition of the jury with the five challenges remaining to him. However, had he exhausted his five remaining peremptories in the selection of regular jurors, presumably he would have been granted an additional four challenges for the selection of alternates. It would be sheer speculation to assume that had defendant exhausted his peremptory challenges and made use of the additional challenges granted him in the selection of alternates, he would have been forced to trial with a jury unsatisfactory to him.

### B. *Denial of Defendant's Motion to Have His Guilt or Innocence Decided by Non-Death-Qualified Jury*

Before the start of voir dire, defense counsel requested that prospective jurors considered for the guilt phase of the trial not be disqualified for opposition to the death penalty. Defense counsel asked that two juries be selected: a non-death-qualified jury to decide his guilt or innocence, and a death-qualified jury to determine penalty, if necessary. Alternatively, counsel proposed to select 12 or more alternate jurors and to postpone death-qualification until after the guilt phase, at which time a death-qualified jury could be selected for the penalty phase by substituting death-qualified alternates for regular jurors who could be excluded for their views against the death penalty. In support of the motion, counsel argued that death-qualification denies the defendant a jury drawn from a representative cross-section of the community. He also argued that such a jury is conviction-prone and focuses unduly on death as an issue rather than guilt or innocence.

The trial court denied the request. A renewed request made at the conclusion of sequestered *Hovey* voir dire was likewise denied. (See *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301].)

Defendant contends the court erred. He concedes that both this court and the United States Supreme Court have rejected various constitutional challenges to the practices followed here. (*Lockhart* v. *McCree* (1986) 476 U.S. 162, 174-177 [90 L.Ed.2d 137, 148-150, 106 S.Ct. 1758]; *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1254 [278 Cal.Rptr. 640, 805 P.2d 899]; *Hovey* v. *Superior Court, supra*, 28 Cal.3d at p. 68.) We decline his invitation to reconsider our earlier decisions.

Raising for the first time an Eighth Amendment challenge, he observes that neither we nor the high court has specifically considered the propriety of death-qualification in light of the constitutional interest in heightened reliability of guilt and penalty phase determinations in capital cases. Insofar as our research enables us to say, his observation is correct. However, his Eighth Amendment claim appears to be merely a restatement of his Sixth Amendment claims, and as such we find it to be without merit.

Defendant also urges us to exercise our supervisory authority over California criminal procedure and disapprove the practice of questioning prospective jurors before the guilt phase on their attitudes toward sentencing choices available at a penalty phase. He does not persuade us to do so.

## GUILT PHASE ISSUES

### A. Angela Womble's Pretrial and In-court Identifications

#### 1. Factual Background

Both before and during the preliminary hearing, as well as at trial, defendant sought to exclude Angela Womble's pretrial and in-court identifications of him, arguing they were the product of improper, suggestive procedures. The trial court conducted an evidentiary hearing on the issue and considered the evidence adduced at the pre-preliminary hearing motion, testimony given at the preliminary hearing, and transcripts of Angela Womble's statements to Detective Shipp during the photo lineups on July 2 and July 22. The trial court ruled the identification testimony admissible. Defendant contends the trial court erred. To assess his claim, we summarize the evidence the trial court reviewed.

Before the July 2 photographic lineup, an investigator received an anonymous telephone call stating that Willie Johnson had been with Allen

Duchine on the day the crimes were committed. Detective Shipp learned of the call and selected a photograph of defendant, taken in 1981, for use in the lineup. Shipp arranged six photographs in each of the two lineups (one for defendant, the other for Duchine) that he planned to show Angela Womble. The names on all of the photographs were covered. On July 2 he showed each lineup to Angela, who was still in the hospital. Before doing so, Shipp admonished her that the person who committed the crime might or might not be in the lineup and that she was under no obligation to select anyone. Angela quickly identified Allen Duchine's photograph in the first lineup.

Before viewing the second lineup, containing defendant's photograph, Angela described the other perpetrator as a "young man, dark-skinned, short haircut, with the earring in one ear." She also said he was tall. Angela stated she did not know the man, but friends and family had told her he was Willie Johnson. When Detective Shipp showed her the second lineup, Angela examined the photographs for 11 seconds, then selected defendant's picture, saying "His face looks familiar . . . [b]ut see, it was dark." She asked if the person in the photograph was "buff";[4] Shipp said he could not answer that. Angela acknowledged she was not positive about the identification, but the photograph "look[ed] like him." The person in the photograph, she said, had the same facial features, round head, and forehead structure.

On July 18, Detective Shipp brought Angela to the county jail to view a live lineup. On the way there, Shipp told her they had a suspect in custody; at the preliminary hearing he testified he told her Willie Johnson was in custody, but at trial he could not remember using that name. They entered the jail through the lobby and did not go into any portion of the building where inmates were housed. No lineup was held because defendant refused to participate, despite being told an attorney had been appointed to represent him.

On July 22, Detective Shipp assembled another photographic lineup, using three of the photographs he had used in the July 2 lineup and a more recent photograph of defendant. Two photographs of men not included in the earlier lineup were also used in the July 22 lineup. Detective Shipp testified to the effect that his aim in reusing three of the photographs from the earlier lineup was to avoid the prejudice inherent in defendant being the only person depicted in both lineups. Defendant was dressed in jail clothes in the newer photograph, but his photograph showed him only from the chest upward so that it appeared he was wearing a gold shirt over a T-shirt. The other persons depicted in the lineup photos were not wearing jail clothing. Angela was unaware defendant was wearing jail clothes in the photograph. As with the

---

[4]Meaning muscular, well built.

earlier lineup, the names on the photographs were concealed. Once again, Detective Shipp admonished Angela that she was not obligated to identify anyone. After examining the lineup for several seconds, she identified defendant's photograph. She was positive about the identification, due to the round head, cheekbone structure, and the side of the ear.

Angela used the name "Willie" in talking about defendant, indicating she had heard the name from family and friends. At trial, Angela testified that someone—she could not remember who—had told her Willie Johnson was responsible because he was running with Allen Duchine. She testified, however, that no one described Willie Johnson or told her anything else about him. She did not recognize any of the photographs from the first lineup as being in the lineup she examined on July 22. She identified defendant's photograph because she remembered him as the person standing over her with the shotgun.

In December 1986, five months after the crime, Angela met with Detective Shipp and the prosecutor. Earlier she had said the gunman wore a shiny earring in his right ear. However, during their December conversation, while facing the prosecutor she pointed to his left ear. At the preliminary hearing, Angela testified she had no doubt it was in the left ear that the gunman wore his earring. Defendant's left ear, not his right, was pierced.

At the conclusion of the evidentiary hearing, the trial court found that defendant had failed to present evidence showing that "the photographic lineup was so impermissibly suggestive as to give rise to a likelihood of . . . irreparable misidentification." (See *People* v. *Floyd* (1970) 1 Cal.3d 694, 712 [83 Cal.Rptr. 608, 464 P.2d 64].) Accordingly, the court admitted Angela's pretrial identifications of defendant in the photo lineups. Angela also identified defendant as the second gunman at trial, based on her independent recollection.

### 2. *Propriety of Admission of Identification Evidence*

██ ██ Defendant renews his contention that Angela Womble's identifications were irreparably tainted by suggestive information and by undue emphasis on defendant's photograph in the July 22 lineup. Specifically, he objects to the fact that defendant was the only person depicted in the photo lineup who was wearing jail clothing and contends that there was an inadequate number of plausible suspects, and that defendant was the only person among the plausible choices who had been in the prior lineup. He also notes that before and after Angela saw the first photo lineup, she was told by family and friends that the second gunman was Willie Johnson,

whom she had never seen before. He contends that after identifying his photograph in the July 2 lineup, Angela indicated uncertainty and began to ask questions to try to confirm the correctness of her choice. Although the police should have been especially careful to avoid suggestive or confirmatory comments, defendant argues, Detective Shipp told Angela en route to a live lineup two weeks later that a "Willie Johnson" had been arrested—thus effectively confirming that Angela had selected the correct man. These infirmities in identification procedures, he contends, deprived him of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and under article I, sections 1, 7, 15, 16, and 17, of the California Constitution.

In *People* v. *Gordon*, *supra*, 50 Cal.3d at page 1242, we articulated the principles that determine whether the admission of identification evidence violates a defendant's right to due process. Constitutional reliability, we said, depends on (1) whether the identification procedure was unduly suggestive and unnecessary (*Manson* v. *Brathwaite* (1977) 432 U.S. 98, 104-107 [53 L.Ed.2d 140, 147-150, 97 S.Ct. 2243]); and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. (*People* v. *Gordon*, *supra*, 50 Cal.3d at p. 1242, citing factors enumerated in *Neil* v. *Biggers* (1972) 409 U.S. 188, 199 [34 L.Ed.2d 401, 411, 93 S.Ct. 375].) "If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable." (*People* v. *Gordon*, *supra*, 50 Cal.3d at p. 1242.)[5]

"It is unsettled whether suggestiveness is a question of fact (or a predominantly factual mixed question) and, as such, subject to deferential review on appeal, or a question of law (or a predominantly legal mixed question) and, as such, subject to review de novo." (*People* v. *Gordon*, *supra*, 50 Cal.3d at p. 1242.) Defendant disagrees, contending the United States Supreme Court in *Neil* v. *Biggers*, *supra*, 409 U.S. at p. 201 [34 L.Ed.2d 412] resolved the issue by employing a de novo standard of review. Defendant overstates his

---

[5]Defendant criticizes the rule in *Gordon*, urging that a correct analysis is one that first determines whether an identification procedure is unduly suggestive, and then weighs the *Biggers* factors against the corrupting effect of the suggestive identification itself. His criticism misses the mark. As we acknowledged in *Gordon*, the *Brathwaite* principles have been "variously phrased in various state and federal decisions." (50 Cal.3d at p. 1242.) In looking to whether the identification itself was reliable under the totality of the circumstances once a determination of suggestiveness has been made, we perform the very weighing process he contends is missing.

case by ignoring the different procedural posture of *Biggers*. Debate over the proper standard of review of claims of impermissibly suggestive identification procedures continues. (See *People* v. *Gordon, supra,* 50 Cal.3d at pp. 1242-1243, and cases cited therein.) ▮ In any event, it is unnecessary for us to pronounce definitively on the question in this case, as we are compelled under any standard of review to conclude the trial court correctly allowed Angela Womble's July 22 photo identification of defendant into evidence.

All of the photographs were of Black males, generally of the same age, complexion, and build, and generally resembling each other. Thus, defendant's photograph did not stand out, and the identification procedure was sufficiently neutral. (See *People* v. *Gordon, supra,* 50 Cal.3d at p. 1243; *People* v. *St. Germain* (1982) 138 Cal.App.3d 507, 520 [187 Cal.Rptr. 915].) Minor differences in facial hair among the participants did not make the lineup suggestive. (See *People* v. *Holt* (1972) 28 Cal.App.3d 343, 350 [104 Cal.Rptr. 572].) Nor did differences in background color and image size among the various photographs render the lineup impermissibly suggestive. (See, *id.* at pp. 349-350 [identification from mixture of black-and-white and color photographs not unduly suggestive].) We cannot agree with defendant that placement of the three "new" photographs in the top row of the display and the three "old" photographs—including the more recent photograph of defendant himself—in the bottom row created two suggestive "subsets" of photos. As the Court of Appeal observed in *People* v. *De Angelis* (1979) 97 Cal.App.3d 837 [159 Cal.Rptr. 111], no matter where in the array a defendant's photograph is placed, he can argue that its position is suggestive. (*Id.* at p. 841.)

Contrary to defendant's view, the use of photographs from the earlier lineup did not reduce the July 22 lineup to the functional equivalent of a three-person array. Such a measure was, as Detective Shipp reasoned, a reasonable way to avoid suggesting to the witness that defendant was the only person seriously suspected. Defendant complains that even if it was not inappropriate to reuse photos of other men from the first lineup in addition to defendant, Detective Shipp should have used "new" photos of those men as he did of defendant and should not have simply reused the same photos. We decline to impose such a requirement. We note that Angela testified at the preliminary hearing that she did not recognize the three photographs from the first lineup when they were shown her during the second lineup.

▮ The fact that defendant was the only person depicted in jail clothing likewise was not unduly suggestive under the circumstances present here. There was no evidence that Angela knew what jail clothing looked like when

she made the identification; although on July 18 she had gone to the county jail expecting to view a lineup, she ventured no farther than the lobby and saw no inmates. She indicated she did not notice defendant's clothes when she selected his photograph from the lineup. There were no identifying marks on defendant's clothing; he merely appeared to be wearing a gold shirt with a T-shirt underneath.

Defendant also contends that the identification procedure was impermissibly suggestive because Detective Shipp improperly confirmed Angela's tentative identification by telling her, en route to the aborted July 18 lineup, that Willie Johnson was in custody. Defendant reasons she must have assumed that she had selected Willie Johnson's photograph on July 2 and that Willie Johnson would be in the July 22 photo lineup. This contention fails because Angela did not know, and never before the crime had seen, Willie Johnson. No names were visible on the photographs she viewed during either lineup. No one other than Detective Shipp ever showed her photographs of suspects in the case. No one described Willie Johnson to her. Knowing the name "Willie Johnson" and that "Willie Johnson" was in custody could not have assisted her in selecting the photograph of the second gunman. Defendant contends that Angela's greater confidence in her identification after the second lineup reflects Detective Shipp's improper confirmation. It more likely stems from the fact that a more recent photograph of defendant was used. None of Detective Shipp's communications with Angela, in our view, constituted improper confirmation of her selection.

Defendant also suggests Angela must have understood that she was expected to make a positive identification from the photo lineup on July 22. The admonition, read by Detective Shipp and acknowledged by Angela, belies the contention.

We thus conclude that the identification procedures employed in this case were not unnecessarily suggestive. Accordingly, we need not go on to the second step of the *Brathwaite* test to determine whether the identification itself was nevertheless reliable under the totality of the circumstances.

B. *Admission of "Prior Inconsistent Statement" by Angela Womble*

On July 22, 1986, Angela Womble selected defendant's photograph out of a photo lineup, stating she was positive it depicted the person who killed her mother. At trial, defense counsel asked Angela on cross-examination whether she had identified the July 22 photograph "by name." She replied, "I might have, I don't remember. I remember saying this is him, and it wasn't by name, it was by his face." On redirect examination, the

prosecutor asked Angela, "When you identified that photograph on the 22nd of July, who were you identifying?" She responded, "Willie Johnson."

Based on these responses, the prosecutor moved to admit the following preliminary hearing testimony into evidence as an inconsistent statement:[6] "[DEFENSE COUNSEL.] When you looked at the second set of photographs, did you feel that the person you identified was the proper person because he looked like a person in the photographs you saw in the first set of photographs? [¶] [ANGELA WOMBLE.] No. I remembered him as the one standing over me with the 12 gauge shotgun, that's what I remembered."

Over a defense objection, the trial court allowed the preliminary hearing testimony to be read to the jury. This, defendant contends, was error.

■ A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770.[7] The "fundamental requirement" of section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony. (*People* v. *Sam* (1969) 71 Cal.2d 194, 210 [77 Cal.Rptr. 804, 454 P.2d 700].) Normally, the testimony of a witness that he or she does not remember an event is not inconsistent with that witness's prior statement describing the event. (*People* v. *Green* (1971) 3 Cal.3d 981, 988 [92 Cal.Rptr. 494, 479 P.2d 998].) However, courts do not apply this rule mechanically. "Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation], and the same principle governs the case of the forgetful witness." (*Ibid.*) When a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. (*Id.* at pp. 988-989.) As long as there is a reasonable basis in the record for concluding that the

---

[6]Initially, the prosecutor sought to have the testimony admitted as a prior *consistent* statement. (Evid. Code, §§ 791, 1236.) By the time of the hearing on the defense objection, the prosecutor had abandoned that theory. As defendant correctly notes, the testimony would not have been admissible under the theory it was a prior consistent statement, since defense counsel had made no express or implied charge that Angela's trial testimony was recently fabricated, or influenced by bias or other improper motive. The defense merely attempted to show that Angela's identification of defendant was mistaken. Even if the defense could be said to have made some implicit claim of fabrication, bias, or motive, there is no suggestion that it arose after she testified at the preliminary hearing.

[7]Evidence Code section 1235 provides as follows: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

Evidence Code section 770 provides that: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

witness's "I don't remember" statements are evasive and untruthful, admission of his or her prior statements is proper. (*People* v. *O'Quinn* ( 1980) 109 Cal.App.3d 219, 225 [167 Cal.Rptr 141].)

▮ Our examination of the record discloses no reasonable basis for a belief that the testimony Angela gave at trial was inconsistent with that which she gave at the preliminary hearing. The statement she made on cross-examination ("I might have, I don't remember. I remember saying this is him, and it wasn't by name, it was by his face.") is, despite her momentary expression of uncertainty, essentially to the same effect as her prior testimony: that she identified defendant based on her memory of his appearance as he was committing his crimes. The most one can say about the response she gave on redirect examination (that she identified "Willie Johnson" in the photo lineup) is that it was somewhat ambiguous, not that it was necessarily inconsistent with her prior statement or evasive in any way. Admission of Angela Womble's preliminary hearing testimony was, therefore, erroneous.

The error was, however, harmless despite the prosecutor's reference to the testimony in his closing argument. Angela identified defendant as the second gunman at trial based on her independent recollection. She also testified that when she identified defendant's photographs on July 2 and July 22, she had an independent recollection of what the man who shot her mother looked like. She testified that she never saw any photographs of "Willie Johnson" apart from the ones shown her by Detective Shipp, she did not see any names on the lineup photographs, and no one described Willie Johnson to her. Thus, it is not reasonably probable that admission of the preliminary hearing testimony affected the verdict. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see *People* v. *Andrews* (1989) 49 Cal.3d 200, 211 [260 Cal.Rptr. 583, 776 P.2d 285].) Because Angela Womble was subject to cross-examination both at the preliminary hearing and at trial, defendant was at no time denied his constitutional right of confrontation. (See *California* v. *Green* (1970) 399 U.S. 149, 155-156 [26 L.Ed.2d 489, 495, 90 S.Ct. 1930].) His other claims of state and federal constitutional error likewise fail.

C. *Defendant's Refusal to Participate in Lineup*

1. *Factual Background*

On July 17, 1986, Detective Shipp advised defendant, who was in custody, of his *Miranda* rights,[8] and informed him he had been arrested on suspicion of murder. Defendant said he understood his rights and declined to talk to Shipp.

---

[8]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

The next day, Shipp attempted to arrange a live lineup at the Contra Costa County jail in Martinez, where defendant was being held. Deputy Sheriff Padilla spoke to defendant through the intercom system in defendant's cell, stating defendant would have to go downstairs. Padilla then went to defendant's cell, telling him he was going downstairs for a lineup. Defendant refused, declaring Padilla could not make him go.

Meanwhile, Attorney Nancy Kramer, who had been appointed to represent defendant at the lineup, had arrived at the jail on the morning of July 18 and sought to speak with him. She was told there was a problem in locating him and was asked to wait while officials determined where he was being housed. Kramer left the jail at noon without having seen defendant. She returned between 1 and 1:30 p.m. and waited in a holding room. She was informed that defendant had been placed in a different module in protective custody, which was why he had not been located earlier. About 30 minutes later, she was told that defendant would not speak with her and was refusing to participate in the lineup.

Detective Shipp and Angela Womble arrived at the county jail about 2:56 p.m. In the jail lobby, Shipp spoke with Kramer and Padilla regarding defendant's refusal to participate in the lineup. Shipp and an investigator went to defendant's cell. Shipp advised defendant that he had no right to refuse to stand in a lineup and that if he refused, the district attorney could comment about the refusal at trial. Defendant asked, "Well, who do I have standing there with me?" Shipp explained that an attorney had been appointed for him and would be present when the persons for the lineup were selected. Shipp asked defendant if he still refused. Defendant said he did.

Kramer left the jail without having communicated with defendant.

Defendant objected to introduction of evidence of his refusal to stand in a lineup. After holding an evidentiary hearing, the trial court overruled the objection. Defendant contends the trial court erred.

### 2. *Admission of Evidence of Refusal*

■ Defendant urges that in the circumstances of this case, admission of his refusal to stand in a lineup denied him due process and violated his privilege against self-incrimination and his rights to counsel and to protection against cruel and unusual punishment. (Cal. Const., art. I, §§ 7(a), 15, 17; U.S. Const., 5th, 6th, 8th, & 14th Amends.) We reject his contentions.

The privilege against self-incrimination extends to compelled testimonial or communicative disclosures by an accused, but not to "real" or "physical"

evidence derived from him. (*Schmerber* v. *California* (1966) 384 U.S. 757, 760-765 [16 L.Ed.2d 908, 913-916, 86 S.Ct. 1826]; *People* v. *Ellis* (1966) 65 Cal.2d 529, 533-537 [55 Cal.Rptr. 385, 421 P.2d 393] [voice identification testimony not protected by self-incrimination privilege].) A defendant's appearance, as manifested in a lineup, is one such type of nontestimonial, physical evidence. Accordingly, it is not protected by the privilege (*United States* v. *Wade* (1967) 388 U.S. 218, 221-223 [18 L.Ed.2d 1149, 1153-1155, 87 S.Ct. 1926]), and evidence of a defendant's refusal to participate in a lineup is admissible at his trial. (*People* v. *Huston* (1989) 210 Cal.App.3d 192, 216-217 [258 Cal.Rptr. 393]; *People* v. *Smith* (1970) 13 Cal.App.3d 897, 910 [91 Cal.Rptr. 786, 52 A.L.R.3d 875] [defendant's refusal, during show-up at police station, to don jacket and cap allegedly worn by robber not protected by self-incrimination privilege]; see also *Quintana* v. *Municipal Court* (1987) 192 Cal.App.3d 361, 365-366 [237 Cal.Rptr. 397] [defendant's refusal to submit to blood-alcohol test not protected by self-incrimination privilege], citing *South Dakota* v. *Neville* (1983) 459 U.S. 553, 562-564 [74 L.Ed.2d 748, 757-759, 103 S.Ct. 916].)

■ Defendant argues that evidence of his refusal to participate in the lineup nonetheless should have been suppressed because he was denied his right to counsel during a critical stage of the prosecution against him. He bases this argument on the fact that jail authorities failed to afford him an opportunity to meet with Attorney Nancy Kramer when she arrived at the jail asking to see him. He relies on *People* v. *Bustamante* (1981) 30 Cal.3d 88 [177 Cal.Rptr. 576, 634 P.2d 927] (*Bustamante*), in which we held that the California Constitution affords a suspect a right to counsel at a preindictment lineup (*id.* at p. 102), and *People* v. *Houston* (1986) 42 Cal.3d 595 [230 Cal.Rptr. 141, 724 P.2d 1166] (*Houston*), in which we held that, under the right to counsel afforded by the California Constitution, a suspect in custody must be informed promptly of his attorney's arrival at the detention facility, and must then be allowed to see the attorney if he so chooses before questioning begins or resumes (*id.* at p. 610).

*Bustamante, supra,* 30 Cal.3d 88, does not assist defendant, inasmuch as counsel *was* appointed for him in advance of the lineup. Nor does *Houston, supra,* 42 Cal.3d 595, benefit defendant, since defendant was not subjected to questioning. (See *People* v. *Mattson* (1990) 50 Cal.3d 826, 868-869 [268 Cal.Rptr. 802, 789 P.2d 983] [*Houston* rule is limited to the facts of that case.].) In any event, the exclusionary rules in both *Bustamante* and *Houston* were abrogated by the passage of Proposition 8, an initiative adopted by the voters of this state on June 8, 1982. Among other provisions, Proposition 8 added section 28 to article I of the state Constitution. That section abrogated judicial decisions requiring exclusion of relevant evidence from criminal

proceedings, except as compelled by the federal Constitution or other statutes not implicated here. (*People* v. *May* (1988) 44 Cal.3d 309, 315-319 [243 Cal.Rptr. 369, 748 P.2d 307].) ▮▮▮▮ As defendant's crime occurred after the adoption of Proposition 8, the exclusionary rules of *Bustamante* and *Houston* have no application to this case.[9]

Defendant asserts a violation of his federal constitutional right to counsel, chiefly by way of attempting to distinguish *Kirby* v. *Illinois* (1972) 406 U.S. 682 [32 L.Ed.2d 411, 92 S.Ct. 1877] and *Moran* v. *Burbine* (1986) 475 U.S. 412 [89 L.Ed.2d 410, 106 S.Ct. 1135]. *Kirby* held that the federal constitutional right to counsel does not attach until the initiation of judicial criminal proceedings. (*United States* v. *Gouveia* (1984) 467 U.S. 180, 187-188 [81 L.Ed.2d 146, 153-154, 104 S.Ct. 2292]; *Kirby* v. *Illinois, supra,* 406 U.S. at pp. 689, 691 [32 L.Ed.2d at pp. 417, 418] (plur. opn. of Stewart, J.) (conc. opn. of Burger, C. J.).) *Burbine* reaffirmed that the right to counsel attaches with the commencement of judicial proceedings against an accused. In *Burbine,* the court concluded that police officers' failure to notify the accused—who was in custody but had not been formally charged—of his attorney's attempts to telephone him neither invalidated his waiver of *Miranda* rights nor impaired his right to counsel. (*Moran* v. *Burbine, supra,* 475 U.S. at pp. 421-428 [89 L.Ed.2d at pp. 420-425].) Defendant attempts to distinguish these cases by noting that (unlike Kirby) he had counsel and (unlike Burbine) he did not waive the right to counsel or his self-incrimination privilege. These distinctions do not make a difference because appearance in a lineup does not implicate the privilege against self-incrimination.

▮ Defendant characterizes his conversation with Detective Shipp, during which he refused to stand in the lineup, as custodial interrogation in

---

[9]Defendant contends that Proposition 8 was not intended to permit introduction of evidence that was obtained by police misconduct in a manner that undermines the credibility of the evidence itself. (Cal. Const., art. I, § 28, subd. (d) ["Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, sections 352, 782 or 1103."].) Defendant's complaint is essentially that because he previously had been given and asserted his *Miranda* rights, it was reasonable for him to conclude that he had the right to remain in his cell and do nothing to assist the police in his prosecution. Thus, his refusal to stand in a lineup was not a reliable indication of consciousness of guilt and should have been excluded under Evidence Code section 352. The trial court's failure to do so, he claims, deprived him of due process.

We disagree. *Miranda* warnings, which advise the suspect that anything he *says* may be used in evidence, do not contradict an admonition that a suspect has no right to refuse to stand in a lineup. Defendant was expressly warned that he had no right to refuse to participate and that his refusal could be used against him at trial. In light of that warning, his refusal was not unreliable as an indication of his consciousness of guilt. Therefore, Evidence Code section 352 provided no basis for its exclusion, and its admission did not violate due process.

We also reject defendant's assertion, citing *People* v. *Boyer* (1989) 48 Cal.3d 247, 273, footnote 14, [256 Cal.Rptr. 96, 768 P.2d 610], that admission of his statements represented an arbitrary abrogation of a state-created right.

violation of *Miranda* v. *Arizona, supra,* 384 U.S. 436. It was not. Interrogation consists of express questioning or of words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. (*Rhode Island* v. *Innis* (1980) 446 U.S. 291, 300-301 [64 L.Ed.2d 297, 307-308, 100 S.Ct. 1682].) Detective Shipp's statements to defendant were limited to conveying information about the proposed procedure and ascertaining whether or not defendant would participate. This neither required readvisement of rights nor amounted to interrogation in violation of *Miranda.* The fact that defendant's responses may have inculpated him was merely incidental to his unprivileged refusal to cooperate in a nontestimonial procedure. Defendant has failed to establish that admission of the fact of his refusal to stand in the lineup, and the statements by which he did so, violated any of his rights under the state and federal constitutions.

### D. *Prosecutorial Argument*

#### 1. *Prosecutor's "Testimony" and Asserted Vouching*

 Defendant contends that several remarks by the prosecutor during his guilt phase closing argument amounted to unsworn testimony or had the effect of vouching for prosecution witnesses, and so constituted misconduct. (See *People* v. *Bolton* (1979) 23 Cal.3d 208, 212 [152 Cal.Rptr. 141, 589 P.2d 396]; *People* v. *Perez* (1962) 58 Cal.2d 229, 245-246 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946].) He has waived each claim of misconduct by failing to object and request an admonition to the jury. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1235 [283 Cal.Rptr. 144, 812 P.2d 163]; *People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].) His failure to object is not excused: in each instance any harm could have been cured by prompt admonition. Moreover, as will appear, even if defendant had preserved his claims of prosecutorial misconduct, we would find no reversible error.

 Defendant first argues that the prosecutor argued improperly regarding the change in Angela's testimony about the perpetrator's earring. Angela initially stated that she noticed a shiny stud in the second gunman's right ear. (Defendant's left ear, not his right, is pierced.) In a conversation with Detective Shipp and the prosecutor shortly before the preliminary hearing, however, Angela determined the stud was, in fact, in the perpetrator's left ear. Both Angela and Detective Shipp testified regarding that conversation. In essence, Detective Shipp testified that Angela reached toward her own right ear, but then paused and spontaneously pointed at the prosecutor's left ear. Shipp testified that he told her she was pointing to her

right ear, and that Angela agreed, and indicated the stud was in defendant's left ear. Shipp testified that neither he nor the prosecutor suggested to Angela which ear was the correct one. On cross-examination, Detective Shipp acknowledged that the conversation had not been tape-recorded. Referring to the change in her testimony regarding the gunman's earring, Angela testified she "did it all on [her] own." Based on this testimony, the prosecutor argued, "[A]ll I could do is submit to you that no suggestion was made in any way to Angela as to which hole or which pierced ear the defendant, Mr. Johnson, had." Defense counsel, in turn, stated in closing argument that "[t]his movement of the earring really upsets me. People can be wrong, sure, but the earring never gets moved until two days before preliminary hearing, the 16th of December in an unrecorded conversation between the district attorney and Detective Shipp after Willie Johnson has been arrested for murder and after he has had his left ear photographed." In rebuttal, the prosecutor argued, "The second time that same question [the location of the earring], it was not a leading question, it was not a suggestive question, ladies and gentlemen, I more than anybody else wish there was a tape of that interview, because I submit to you if you heard a tape of that, if you heard the spontaneity following the pregnant pause, if you will, and that ear, and Detective Shipp saying that's your right, the clear reliability and spontaneity of that pointing would be manifest. But, we don't have that taped. All I can do is submit it on the testimony of Angela Womble and Detective Shipp that that is in fact what happened." The prosecutor also told the jury that "[A]ll I could do is submit to you that no suggestion was made in any way to Angela as to which hole or which pierced ear the defendant . . . had."

Defendant contends that the prosecutor injected into closing argument his own unsworn testimony regarding the conversation among himself, Angela, and Detective Shipp. Although defendant's contention is not without some force, we conclude the prosecutor's line of argument was sufficiently supported by the testimony of Angela Womble and Detective Shipp to avoid characterization as misconduct. The prosecutor's use of the term "spontaneity" echoed Detective Shipp's testimony as well as Angela's testimony that she "did it all on [her] own." The prosecutor was entitled to express his personal wish that the conversation had been recorded, since defense counsel had implicitly accused the prosecutor of suggesting that Angela change her description of the second gunman; the jury would have appreciated the context of the remark. (See *United States* v. *Young* (1985) 470 U.S. 1, 17-18 [84 L.Ed.2d 1, 14, 1055 S.Ct. 1038].) Even if we could agree with defendant that the remarks strayed beyond the evidence, we would find them harmless. The jury had the oportunity to hear Detective Shipp and Angela Womble testify to the circumstances of the interview, and thus could judge their credibility independently of the prosecutor's argument.

Defendant also contends that the prosecutor engaged in misconduct by calling Angela Womble's identification of defendant as reliable an identification as may be found in a courtroom. We disagree; the statement cannot reasonably be interpreted as vouching, but would have been understood as an invitation to draw the desired inference.

■ Defendant further argues that the prosecutor gave unsworn testimony in suggesting to the jury a way to interpret Angela's reference to the second gunman as "tall": that defendant, although only five feet, nine and three-quarters inches in height, was tall compared with Willie Womble. Unfortunately for the prosecutor, no witness had testified to Willie Womble's height. To overcome the difficulty, the prosecutor argued the jury could calculate, from the dimensions of the room and the distance of the body from the east wall, that Willie Womble was five feet three inches tall.[10] Defendant complains that the method by which the prosecutor derived Willie Womble's height was fallacious, and that in effect the prosecutor simply urged the jury to take his word for it that she was five feet three inches tall.

We find no misconduct. The prosecutor avoided the error of stating that the pathologist would have testified that Willie Womble was indeed five feet three inches (see *People* v. *Johnson* (1981) 121 Cal.App.3d 94, 102 [175 Cal.Rptr. 8]); instead, he conceded he had not asked the proper questions and made a rather strained argument from other evidence that the jury should so find. If the prosecutor's reasoning was faulty, the jury was free to reject it.

■ Defendant next contends that the prosecutor engaged in misconduct by referring to autopsy photographs not in evidence and by specifically noting with respect to one item, "[Y]ou're not going to see a picture of it." No misconduct appears. The pathologist described Willie Womble's injuries as depicted in eight autopsy photographs. The trial court later ruled it would admit three of the photographs in evidence and exclude the remaining five. It would have been apparent to the jury, on retiring to deliberate, that the number of exhibits before them did not correspond to the number of photographs about which the pathologist had testified. We are unpersuaded the prosecutor's remark could have led the jury to speculate what else might be shown in the photographs not admitted.

---

[10]The prosecutor said, "How do you know that Willie Womble is five foot three inches tall? It's true she's at a slight angle here. Her head, and this is in evidence, is two foot one inches, the top of her head, from the east wall. Her right big toe is seven foot seven inches from the east wall. That's five foot six, but you can see in the pictures too, her toes are extending out below the level of her heels because she's laying on her stomach. [¶] Now, *unfortunately I should have asked Dr. Dougherty [sic] how tall Willie Womble was, but with all of the questions that were asked, that's the one question I did not ask, but you can take a look at that evidence. That was in evidence.*" (Italics added.)

 Finally, defendant urges the prosecutor used his closing argument to "testify" to the reasons why criminalist Fukayama undertook a reexamination of the shotgun shells taken from the Womble residence. Defense counsel, in argument, suggested that reexamination was done to "fit a case around Willie." In rebuttal, the prosecutor described the initial tests performed by Fukayama and certain omissions from his analysis, stating, "The point is not what Mr. Fukayama's conclusions were, that wasn't the problem. The problem was with his method. It was unprofessional." The prosecutor elaborated: "The problem was the incomplete examination and for that reason, and only that reason, that evidence went back to Mr. Fukayama in January after the preliminary hearing. I can only submit that to you but I submit to you that is in fact the case."

Defendant contends that because there was no testimony either specifically labelling Fukayama's analysis "unprofessional" or directly stating that the reason for the reexamination was the incompleteness of the initial examination, the quoted argument constituted misconduct. We believe the prosecutor's comments that Fukayama's method was "unprofessional" and "incomplete" were fair inferences from the evidence, inasmuch as Fukayama described the deficiencies in his initial analysis and admitted his initial conclusion was wrong. However, the prosecutor went beyond the evidence when he argued that the *only* reason Fukayama reexamined the evidence was the incompleteness of the initial analysis. Fukayama did not so testify, and the prosecutor, as the person in charge of the proceedings against defendant, was in the best position to know why Fukayama was asked to reexamine the evidence. In effect, the prosecutor "submitted" the point on his own representation. We see no possibility that defendant was prejudiced, however, in light of the admitted deficiencies in Fukayama's initial analysis and his testimony that the prosecutor did not apply any undue influence or pressure on him. None of the claimed instances of misconduct, therefore, rendered defendant's trial unfair or unreliable. Because we find no prejudice, defendant's claim of ineffective assistance of counsel must likewise fail. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216 [233 Cal.Rptr. 404, 729 P.2d 839].)[11]

### 2. Claimed Griffin Error

 Defendant argues that the prosecutor improperly drew the jury's attention to the fact that he had not testified at trial, violating his privilege

[11]Defendant ascribes great importance to the prosecutor's reference to Fukayama's testimony because, he contends, Fukayama lied on the witness stand. Fukayama initially testified he gathered some relevant information by calling the proprietor of a gun shop. Later he clarified that he personally had been unable to reach the shop owner, but another criminalist had actually spoken to him. On this record, we hesitate to infer a desire on Fukayama's part to deceive the court or the jury, and believe defendant overestimates the significance of the incident.

against self-incrimination and other constitutional rights. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 1, 7, subd. (a), 15, 16; *Griffin* v. *California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 110, 85 S.Ct. 1229].) Defendant failed to object to the statements he now challenges, and so has waived his claim of misconduct. (*People* v. *Ratliff* (1986) 41 Cal.3d 675, 690-691 [224 Cal.Rptr. 705, 715 P.2d 665]; *People* v. *Green, supra,* 27 Cal.3d at p. 27.) ■ Even if he had preserved the claim, we would find it meritless, as we perceive no reasonable likelihood that the jury could have understood any of the statements in the manner defendant urges. (*People* v. *Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

In closing argument, the prosecutor discussed defendant's liability for aiding and abetting Duchine in the robbery, noting that the jury did not receive an aiding and abetting instruction with respect to the murder and attempted murder counts because defendant personally killed Willie Womble and shot Angela Womble. The prosecutor argued that defendant committed those crimes to avoid being identified. "Why did he do that? What was the point in doing something like that? . . . I'm going to talk about it in some detail a little while later when I talk about specific items of evidence, when I talk about the earring, when I talk about the lighting conditions, but you know you have Angela Womble who told you and she certainly should know what the lighting conditions, what the ability to see inside that house was, and I'll talk about that and show you a little demonstration and you have a number of other witnesses . . . . [T]here was somebody else in that house who knew what the lighting conditions were. There was somebody else in that house who knew Willie and Angela Womble could see and not see [*sic*]. Somebody else in that house who was concerned about being identified and, therefore, perpetrated this murder and this attempted murder to prevent those persons from coming forward and identifying them for the killing or for the robbery, and based on that, they killed. [¶] There's somebody else, ladies and gentlemen, who knows what Angela knows and who killed because of it, and that man is Willie Darnell Johnson. That's why there's another part of this special circumstance instruction that is important. [¶] The Court instructed you a special circumstance is not established if it was merely incidental to the commission of the murder. . . . [¶] You don't have that in this case. [¶] The primary intent, ladies and gentlemen, was robbery. The motive for the murder was to use the language of the law, to avoid detection. To kill witnesses who Angela's last words in the tape could identify."

Defendant contends a reasonable juror would have understood the quoted passage as commenting on his failure to testify. We disagree. The prosecutor was referring neither directly nor indirectly to defendant's failure to testify.

Rather, his argument addressed the issues of whether the lighting in the Womble residence was sufficient to enable Angela and her mother to identify the perpetrator of the crime, and whether the murder was done in order to facilitate the robbery, as required to establish the special circumstance allegations. The rule in *Griffin* v. *California, supra,* 380 U.S. 609, does not extend to comments on the state of the evidence (*People* v. *Anderson* (1990) 52 Cal.3d 453, 472-473 [276 Cal.Rptr. 356, 801 P.2d 1107]), and was not implicated in the instance defendant cites.

■ Defendant also complains the prosecutor committed *Griffin* error in arguing that "[t]he uncontradicted evidence is that the defendant was there, that the defendant did kill Willie Womble, that the defendant did shoot Angela Womble. That is uncontradicted." It is true, as defendant asserts, that a prosecutor errs by referring to evidence as "uncontradicted" when the defendant, who elects not to testify, is the only person who could have refuted it. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 758, fn. 20 [175 Cal.Rptr. 738, 631 P.2d 446].) If, however, the evidence could have been contradicted by witnesses other than the defendant, the prosecutor may without violating defendant's privilege against self-incrimination describe the evidence as "unrefuted" or "uncontradicted." (*Ibid.*; see also *People* v. *Miller* (1990) 50 Cal.3d 954, 996 [269 Cal.Rptr. 492, 790 P.2d 1289]; *People* v. *Gray* (1979) 91 Cal.App.3d 545, 552 [154 Cal.Rptr. 555].) Here, the defense challenged Angela's identification testimony, implicitly contending that defendant was elsewhere than at the Womble residence on the night of the crime. However, the defense presented no alibi evidence to support the contention. (*People* v. *Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213].) Thus, the prosecutor's comment merely reflected the state of the evidence. (*People* v. *Murtishaw, supra,* 29 Cal.3d at p. 758, fn. 20.)

3. *Prosecutor's Statement That He Was "Not Permitted to Discuss" Necessity of Verdicts on Robbery and Burglary Charges*

■ After discussing the special circumstance allegations, the prosecutor discussed the elements of the robbery and burglary charges. He argued, "[D]on't think that because I may have already discussed the crimes of robbery and burglary in the context of special circumstances that they are not important—somehow that they are mere surplusages of Counts 3 and 4. *For reasons I'm not permitted to go into right now,* they are not surplusages, they are important." (Italics added.) Defendant now argues that the prosecutor improperly told the jury that its verdicts should be influenced by unstated law and insinuated that legal technicalities might undo the jury's verdicts on some charges unless convictions were returned on all charges. This, he contends, violated his rights to personal presence, confrontation, jury trial, assistance of counsel, and due process.

His failure to object to the comment at trial bars our review. (*People* v. *Green, supra,* 27 Cal.3d at p. 27.) If we were to reach the point, we would find it meritless. We do not interpret the prosecutor's statement as an invitation to let considerations other than the evidence affect the jury's verdict. We see no error in an argument that impresses upon the jury the necessity of fulfilling its duty to decide each of the charges and allegations before it.

E. *Claims of Instructional Error*

1. *Eyewitness Identification (CALJIC No. 2.92)*

Defendant contends that the jury was incorrectly instructed on eyewitness identification factors. ▮▮▮ Defendant is entitled to an instruction that focuses the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence. (*People* v. *Wright* (1988) 45 Cal.3d 1126, 1141 [248 Cal.Rptr. 600, 755 P.2d 1049].) The instruction should not take a position as to the impact of each of the psychological factors listed; it should also list only factors applicable to the evidence at trial, and should refrain from being unduly long or argumentative. (*Id.* at p. 1143.)

The trial court read the jury a modified version of CALJIC No. 2.92, set forth in the margin.[12] We have noted that CALJIC No. 2.92 normally provides sufficient guidance on the subject of eyewitness identification

---

[12]"Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crime charged. You must view eyewitness identification testimony with caution and evaluate it carefully.

"In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as the other factors which bear upon the accuracy of the witness' identification of the defendant; including, but not limited to any of the following: The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act including but not limited to any of the following:

"A. The length of time the witness saw the perpetrator;

"B. The positions and distances between the witness and the perpetrator at various times;

"C. The lighting conditions;

"D. The presence or absence of any circumstances that might focus or distract the witness' attention;

"The stress, if any, to which the witness was subjected at the time of the observation;

"The witness' ability following the observation to provide a description of the perpetrator of the act;

"The extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness;

"The witness' capacity to make an identification;

"Evidence relating to the witness' ability to identify other perpetrators of the criminal act;

"Whether the witness was able to identify the perpetrator in a photographic lineup;

factors. (*People* v. *Wright, supra*, 45 Cal.3d at p. 1141.) Defendant challenges certain aspects of the instruction as given and the rejection of the instruction he proffered on the subject of eyewitness identification. We consider each of his contentions.

### a. *Stress*

 Defendant urges that the portion of the instruction dealing with the influence of stress on identification was erroneous, in that it was confusing and undermined the testimony of Dr. Loftus, defendant's expert witness. The instruction directed the jury to consider "[t]he stress, *if any*, to which the witness was subjected at the time of the observation" (italics added). Defendant contends this portion of the instruction undermined the defense's ability to rely on the testimony of its expert witness, Dr. Loftus. We disagree.

Dr. Loftus testified that the degree of stress or fright that a witness would experience during a crime such as occurred in this case would reduce his or her ability to acquire information accurately. That the situation was stressful was undisputed; the prosecutor acknowledged in closing argument that the stress level was "high" even before the first shot was fired. However, we do not view the instruction as casting doubt on Dr. Loftus's testimony in any significant way. Rather, it allowed the jury to determine the level of stress Angela experienced during the crime.

### b. *Certainty of Identification*

 Defendant further contends that the trial court erred in instructing the jury that the extent to which the witness was either certain or uncertain of the identification was a factor to consider in assessing eyewitness testimony. Defendant asserts that there was no evidence to support this instruction because Dr. Loftus testified without contradiction that a witness's confidence in an identification does not positively correlate with its accuracy. As a corollary to this claim, he argues the instruction was improper because it contradicted Dr. Loftus's testimony, thereby implying the jury could not rely on her evidence.

We cannot agree with defendant's contentions. First, as defendant concedes, the jury remained free to reject Dr. Loftus's testimony although it was

---

"Fairness of the photographic lineup;

"Whether a perpetrator was familiar to the witness;

"Whether a perpetrator was unfamiliar to the witness;

"Testimony of any expert regarding acquisition, retention, or retrieval of information presented to the senses of an eyewitness;

"Whether the witness' memory was or was not affected by intervening time and events;

"The extent to which the witness was either certain or uncertain of the identification;

"Whether the witness' identification is in fact the product of her own recollection."

uncontradicted. (*People* v. *Wright, supra,* 45 Cal.3d at pp. 1142-1143.) The trial court was not required—indeed, was not permitted—to instruct the jury to view the evidence through the lens of her theory. Second, the jury was instructed that it should consider "[t]estimony of any expert regarding acquisition, retention, or retrieval of information presented to the senses of an eyewitness." Thus, if the jury was persuaded by Dr. Loftus's testimony, the instructions allowed it to infer that Angela's positive identification was not necessarily an accurate one.

We cannot agree with defendant that the jury must have found these two portions of the eyewitness identification instruction confusing. His contention would be valid only if the jury were required to accept Dr. Loftus's testimony; as we have seen, it was not.

The trial court did not err, therefore, in instructing the jury on the "certainty" factor.

### c. *Post-event Information*

■ Next, defendant contends that the trial court erred in refusing his request that the jury be instructed as follows: "Was the witness' memory affected by intervening time and events? Memory tends to fade over time, and studies show that a witness may subconsciously incorporate into her memory information from other sources." The trial court did not err. The requested instruction was argumentative, in that it invited the jury to draw inferences favorable to the defendant from specified items of evidence on a disputed question of fact. (*People* v. *Wright, supra,* 45 Cal.3d at p. 1135.) As such, it was properly refused. In addition, the concept that post-event information could contaminate a witness's identification was adequately covered by other instructions. The jury was told to consider "[w]hether the witness' identification is in fact the product of her own recollection" and "[w]hether the witness' memory was or was not affected by intervening time and events."

### d. *Suggestiveness*

■ ■ Defendant contends that the trial court erred in refusing to instruct the jury as follows: "Did the witness identify the defendant before trial from photographs? If so, were the photographs suggestive in any way?" Instead, the court proposed to instruct the jury to consider "[w]hether the witness was able to identify the perpetrator in a photographic lineup" and the "fairness of the photographic lineup." Defense counsel agreed to the use of the word "fairness," observing, "I've got no problems with that . . . it's

common everyday language." Defendant now contends the trial court erred in (1) striking the adjective "alleged" before "perpetrator," and (2) substituting the concept of "fairness" for "suggestiveness."

Defendant's first contention is without merit. Deletion of the word "alleged" from the instruction did not lighten the prosecution's burden of proof. The jury was instructed that, for a guilty verdict, it must be proved beyond a reasonable doubt that defendant was the person who committed the crime. (CALJIC No. 2.91.) The jury was also instructed that defendant was not required to prove himself innocent or to prove that another person committed the crime. Moreover, defense counsel himself stated, "I don't know why we need the word 'alleged.' Perpetrator, I mean, somebody did something——."

Defendant's second contention is likewise meritless. He complains that by changing defendant's proposed instruction on "suggestiveness" into one on "fairness," the court directed the jury's attention away from the issue of conscious or subconscious suggestive influences (including those exerted by unofficial sources such as Angela's family and friends) and instead focused the jury on intentional bias-inducing conduct by the police. It is unclear why defendant complains about this focus. Inasmuch as the instruction dealt with the fairness of *lineups*, it necessarily focused on *official* conduct. The jury's consideration of *unofficial* suggestive influences was sufficiently guided by the instructions to consider "[w]hether the witness' memory was or was not affected by intervening time and events," and "[w]hether the witness' identification is in fact the product of her own recollection."

e. *Multiple Descriptions*

Defendant requested that the jury be instructed as follows: "Did the witness give a description of the offender immediately after the alleged crime? If so how well does the defendant fit that description?" The trial court declined to give the requested instruction, concluding that the subject of that request was adequately addressed by two factors listed in CALJIC No. 2.92, i.e., "The witness' ability following the observation to provide a description of the perpetrator of the act" and "[t]he extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness." Defendant now complains that the instruction the trial court gave is designed for the case in which the eyewitness gives only one description of the perpetrator, not multiple descriptions as did Angela. Defendant argues that by not acknowledging that the jury should consider whether a description given at the scene of the crime might deserve a different weight than a

description given weeks or months later, the instructions indicated that Dr. Loftus's views were unrecognized by the law.

Defendant's contention is incorrect. The instruction given does not limit the jury to consideration of any one description Angela might have provided. The jury was free to consider the extent to which defendant matched any of Angela's descriptions of the perpetrators. In fact, defendant's proposed instruction would have been susceptible to the criticism that it lay undue stress on Dr. Loftus's testimony that a description given nearer in time to an event is more reliable than one given at a later time. The trial court did not err in refusing it.

In sum, the identification instruction given by the trial court met the requirements set forth in *People* v. *Wright, supra*, 45 Cal.3d at pages 1141, 1143: it focused the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence, without improperly invading the domain of either jury or expert witness.

### 2. *Proof Beyond Reasonable Doubt*

 Defendant contends that certain instructions given the jury in this case undermined the constitutional requirement of proof beyond a reasonable doubt. The trial court instructed the jury that defendant was presumed innocent until the contrary was proved and that the presumption placed on the state the burden of proving him guilty beyond a reasonable doubt. (CALJIC No. 2.90; §§ 1096, 1096a.) In four separate instructions—pertaining to the charged crimes, the required mental state, and the special circumstance allegations—the trial court told the jury that if one interpretation of the evidence "appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable." Defendant contends that by telling the jurors that their duty is to accept a guilty interpretation of the evidence as long as it appears to be reasonable, the instructions (1) allow a finding of guilt based on a degree of proof less than that of the reasonable doubt standard (see *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068]) and (2) operate as an unconstitutional mandatory, conclusive presumption of guilt (see *Carella* v. *California* (1989) 491 U.S. 263, 265-266 [105 L.Ed.2d 218, 221-222, 109 S.Ct. 2419]; *Sandstrom* v. *Montana* (1979) 442 U.S. 510, 515 [61 L.Ed.2d 39, 45, 99 S.Ct. 2450]).

We rejected similar contentions in *People* v. *Jennings* (1991) 53 Cal.3d 334, 386 [279 Cal.Rptr. 980, 807 P.2d 1009] (*Jennings*), and while defendant criticizes our reasoning, we are not persuaded to reconsider our holding.

Finally, we note that despite their use of the term "moral certainty," the instructions given in this case do not suffer from the flaws condemned in *Cage* v. *Louisiana* (1990) 498 U.S. 39 [112 L. Ed.2d 339, 111 S.Ct. 328]. As we held in *Jennings, supra,* 53 Cal.3d 334, CALJIC No. 2.90 does not transform true reasonable doubt, as it traditionally has been defined, into some other degree of doubt.

### 3. *Consciousness of Guilt*

The trial court instructed the jury, based on CALJIC No. 2.06, that "[i]f you find that a defendant attempted to suppress evidence against himself in any manner, such as by refusing to participate in the lineup, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. [¶] However, such evidence is not sufficient in itself to prove guilt and its weight and significance, if any, are matters for your consideration."

▪ Defendant contends the giving of this instruction was error for two reasons. First, he argues that it characterized his refusal to participate in the lineup as an attempt to suppress evidence even though his refusal did not demonstrate a consciousness of guilt and its admission into evidence violated the Constitution. This argument is without merit. We have already concluded that defendant's refusal to participate in the lineup was properly admitted and supported an inference of consciousness of guilt. (*Ante,* at pp. 1221-1224].) The giving of the instruction, therefore, was proper (and beneficial to defendant, to the extent that it made clear the refusal did not, in itself, suffice to establish his guilt). (See *People* v. *Sudduth* (1966) 65 Cal.2d 543, 546-547 [55 Cal.Rptr. 393, 421 P.2d 401] [refusal to give breath sample]; *People* v. *Huston, supra,* 210 Cal.App.3d at p. 218; *People* v. *Roach* (1980) 108 Cal.App.3d 891, 894 [166 Cal.Rptr. 801] [refusal to give urine sample].)

▪ Second, he argues that even if the jury could properly have been authorized to consider the lineup refusal as evidence of consciousness of guilt, the instruction was improper because it told the jury that the lineup refusal was only one example of evidence that could be considered as consciousness of guilt. Defendant argues the instruction encouraged the jury to examine all of the evidence—without guidance from the trial court—to determine whether any of it demonstrated an attempt to suppress evidence, regardless of whether such a finding was in fact supported by the law or evidence. This argument is equally meritless. The instruction simply allowed the jury to infer consciousness of guilt if it found that defendant attempted to suppress evidence against himself. Defendant reads too much into the phrase

"in any manner": it merely acknowledges that there are many methods by which evidence may be suppressed. The succeeding phrase—"such as by refusing to participate in the lineup"—pinpoints the evidence supporting the inference.

Defendant contends the instruction violates the rule articulated in *People v. Hannon* (1977) 19 Cal.3d 588 [138 Cal.Rptr. 885, 564 P.2d 1203]. There we held the giving of a modified version of CALJIC No. 2.06 to be erroneous because the trial judge failed to make the preliminary determination that there was evidence in the record which, if believed by the jury, would sufficiently support the desired inference of consciousness of guilt. Instead, the trial court improperly left that question of law up to the jury. (*Id.* at pp. 597-598.) By contrast, in this case the trial court, in giving the instruction, implicitly determined as a matter of law that the evidence of defendant's refusal to stand in the lineup, if credited by the jury, could warrant an inference of consciousness of guilt if the jury found that the refusal was intended to suppress evidence. (See *People v. Crandell* (1988) 46 Cal.3d 833, 870 [251 Cal.Rptr. 227, 760 P.2d 423].)

Defendant does not suggest any way in which the jury might have been misled regarding the sort of evidence it could consider as indicating consciousness of guilt. If he believed the instruction required clarification, it was incumbent on him to request it. (*People v. Crandell, supra*, 46 Cal.3d at pp. 870-871.) He did not do so. Reading the instructions as a whole, as the jury itself was directed to do (CALJIC No. 1.01; see *People v. Pensinger, supra*, 52 Cal.3d 1210, 1246), we conclude they correctly guided the jury's consideration of the evidence.

### 4. *Kurtzman Error*

 Defendant contends that the giving of an expanded version of CALJIC No. 8.75 improperly skewed the jury's deliberative process by precluding deliberation on necessarily included offenses unless and until the jury acquitted defendant of the greater offense. The jury was instructed that "[y]ou must unanimously agree that the defendant is not guilty of first degree murder before you may find the defendant guilty or not guilty of second degree murder" and "[y]ou must unanimously agree that the defendant is not guilty of second degree murder before you find him guilty or not guilty of voluntary or involuntary manslaughter, assault with a deadly weapon or by means of force likely to produce great bodily injury, possession of a deadly weapon with intent to assault, brandishing a firearm or simple assault."

In *People v. Kurtzman* (1988) 46 Cal.3d 322 [250 Cal.Rptr. 244, 758 P.2d 572], we held that *Stone v. Superior Court* (1982) 31 Cal.3d 503 [183

Cal.Rptr. 647, 646 P.2d 809] should be read to authorize an instruction that the jury may not *return a verdict* on the lesser offense unless it has unanimously agreed that defendant is not guilty of the greater crime charged, but should not be interpreted to prohibit a jury from *considering* or *discussing* the lesser offenses before returning a verdict on the greater offense. (*People* v. *Kurtzman, supra* 46 Cal.3d at pp. 324-325.)

There is no reasonable likelihood that the jury understood the instruction as defendant argues. (*People* v. *Clair, supra,* 2 Cal.4th at p. 663.) The instruction given in this case complies with *Kurtzman, supra,* 46 Cal.3d 322, in that it does not preclude the jury from considering or discussing lesser included offenses before returning a verdict on the greater offense; it merely requires the jury to acquit defendant of the greater charge before finding him guilty or not guilty of a lesser charge. (*People* v. *Nicolaus* (1991) 54 Cal.3d 551, 580 [286 Cal.Rptr. 628, 817 P.2d 893]; *People* v. *Hunter* (1989) 49 Cal.3d 957, 976 [264 Cal.Rptr. 367, 782 P.2d 608].) Indeed, the instruction told the jury that "if you unanimously agree that the defendant is not guilty of the offense of first degree murder and second degree murder charged in Count 1, you must have your foreman date and sign such verdict and return them into court regardless of what may happen in your deliberations on any lesser included offenses . . . ." A reasonable inference from this instruction is that the jury may deliberate on lesser included offenses before it has returned its verdict on the first and second degree murder charges.

Citing portions of the prosecutor's argument, defendant suggests that instruction must have misled the jury. He does not persuade us. Defendant notes that the prosecutor at one point said, "I would submit to you essentially what that instruction tells you to do is you address the crime as charged first and if and only if you return a verdict of not guilty on the crimes charged do you even reach the question of the lesser and included offenses. [¶] Your first job is to look at the crimes charged, and, ladies and gentlemen, for reasons I'm going to go into at some length, you are not going to reach those lesser and included offenses." This portion of the prosecutor's argument might support defendant's contention. Defendant acknowledges, however, that the prosecutor also argued as follows: "The defendant is charged with murder in the Information in Count 1. I would submit to you your first decision is, did he do it? Was he there? Did he have a shotgun? I'll talk about those facts that show you that he did in a moment, but when you reach that conclusion, and I submit to you you will, you have got an unlawful killing of a human being. You have the intent to kill, that's malice aforethought. *Before you go further because of a legislatively created mitigating circumstance called heat of passion, I submit to you the next place you have to go before you reach the question of premeditation and deliberation is manslaughter, sudden quarrel,*

*heat of passion.*" (Italics added.) It is clear that this portion of the prosecutor's argument contemplated that the jury would consider the lesser included offense of manslaughter at the same time it deliberated on the murder charge. On this record, we believe it unlikely the instruction affected the jury's deliberative process to defendant's detriment.

 Defendant also contends that the giving of CALJIC No. 8.75 amounted to a violation of section 1097 and, consequently, a deprivation of due process. The contention is erroneous. Section 1097 provides that "[w]hen it appears that the defendant has committed a public offense, or attempted to commit a public offense, and there is reasonable ground of doubt in which of two or more degrees of the crime or attempted crime he is guilty, he can be convicted of the lowest of such degrees only." In this case, the jury was instructed that "[i]f you are convinced beyond a reasonable doubt that the crime of murder has been committed by the defendant but you have a reasonable doubt whether such murder was of the first or of the second degree, you must give the defendant the benefit of the doubt and return a verdict fixing the murder as of the second degree." (CALJIC No. 8.71.) There is no conflict between CALJIC Nos. 8.75 and 8.71, and the instructions given in this case did not violate section 1097.

### F. *Cumulative Effect of Errors*

 Defendant contends that even if no single error in the guilt phase of his trial warrants reversal of his conviction, the cumulative effect of such errors does demand relief. We have identified as errors only the admission of an assertedly inconsistent prior statement by Angela Womble and one instance of impropriety by the prosecutor in closing argument. Neither individually nor cumulatively do these errors warrant reversal.

### PENALTY PHASE FACTS

### A. *Prosecution Case*

#### 1. *Prior Manslaughter Conviction*

The prosecution introduced certified copies of court records showing that a jury had convicted defendant of voluntary manslaughter with the use of a firearm on August 3, 1981. Dick Tak, a Richmond police officer, testified that he attended the autopsy of the victim, Vernon Hood. The victim had been shot twice, once in the back of the head and once in the back.

Clyde Moore testified that he was defendant's parole officer in June 1986. Defendant was paroled from prison on the manslaughter conviction on June

25, 1986. The following day, Moore saw defendant and explained the conditions of parole to him. He never saw defendant again as a parolee.

### 2. *Prior Unadjudicated Battery*

Tommie Phillips, a Richmond police officer, testified that on July 19, 1980, he responded to a call relating to a vehicle accident. Officer Phillips saw defendant punch a woman in the mouth, and arrested him for battery. As Officer Phillips walked defendant to the patrol car, defendant declared he was not going to jail and ran off. However, defendant returned to the accident scene, and Officer Phillips took him into custody.

### B. *Defense Case*

The defense adduced evidence that Vernon Hood, the victim of defendant's prior manslaughter, was a violent man. Gladys Reese, defendant's sister, testified that she lived with Hood, who was the father of one of her children, for about three years. When they lived together he took her money and repeatedly beat her and her children. Because of the beatings, Gladys Reese moved to her mother's house. Hood visited her there and threatened to kill her and her mother. Defendant was also living with his mother at that time. Defendant's mother, Valine Duckett, corroborated that Hood often beat Gladys and her children and took her money.

Renee Morgan, defendant's younger sister, described conditions in the family home as they were growing up. There were nine children in the family. Their mother drank. Defendant protected and took care of the younger siblings. Renee was present when Hood beat Gladys and testified that Hood came to their house with guns.

Valine Duckett also testified about conditions of defendant's early life. Ms. Duckett left her husband while pregnant with defendant. Defendant's father saw his children only a few times, and defendant was without a male role model while growing up. Ms. Duckett remarried and frequently fought with her husband. During their final fight, she killed him in self-defense while defendant and the other children watched.

Despite these problems, defendant did well in school; he was Ms. Duckett's only son to graduate from high school.

PENALTY PHASE ISSUES

A. *Admission of Evidence of Other Criminal Activity*

 1. *Prior Conviction of Voluntary Manslaughter*

As described above, during the penalty phase the prosecution introduced evidence of the facts underlying defendant's prior conviction of voluntary manslaughter. (§ 192, subd. (a).) Testimony by Officer Tak showed that the victim, Vernon Hood, had been shot once in the head and once in the back. Defendant's parole officer testified that defendant was released from San Quentin prison on June 25, 1986, and reported to Moore once, on June 26, 1986, to be advised of the terms and conditions of his parole. Defendant contends that this evidence was highly prejudicial to him. He further contends that its admission violated section 190.3 and denied him due process and equal protection of law as well as constitutional protections against double jeopardy and unreliable penalty determination.

First, he argues that, on the evidence presented, the prior conviction of voluntary manslaughter constituted an implied acquittal of murder. He reasons that the evidence was, therefore, barred by section 190.3, which provides that irrespective of the evidence of other criminal activity that is admissible at the penalty phase of a capital trial, evidence of prior criminal activity for an offense of which the defendant was prosecuted and acquitted is inadmissible. The trial court permitted the prosecutor to present the facts of the prior conviction, but not to argue that the evidence established any of the elements of murder. Defendant contends that admission of testimony concerning the facts underlying a prior conviction necessarily entails admitting at least some evidence of the original, greater charge. Thus, he argues, the jury will prejudicially consider him guilty of the greater crime of murder, of which he was impliedly acquitted.

Defendant's argument is flawed as a factual matter: defendant was not acquitted, either expressly or impliedly, of the murder of Vernon Hood, since the information filed in the earlier proceedings charged only manslaughter. Defendant notes that the complaint filed in municipal court charged him with the murder of Vernon Hood rather than voluntary manslaughter, and argues that the facts of the underlying case could have been construed as supporting a murder conviction. In this case, however, the prosecutor never suggested that the jury should consider the killing of Vernon Hood as the equivalent of murder, nor was the jury instructed it could do so. Rather, the jury was instructed on the elements of voluntary manslaughter and was told that before it could consider the killing of Vernon Hood as an aggravating

circumstance, it must be satisfied beyond a reasonable doubt that defendant did in fact commit that crime. The jury was also instructed that the only aggravating factors it could consider were those listed in the instructions. Thus, we find it improbable that the jury could have made improper use of the evidence as defendant speculates.

We have also rejected the premises underlying defendant's claim as a matter of law. ▪▪▪ In *People* v. *Melton* (1988) 44 Cal.3d 713 [244 Cal.Rptr. 867, 750 P.2d 741], we held that section 190.3, factor (b), allowed proof of any violent criminal activity regardless of whether it led to prosecution and conviction, except as to offenses of which the defendant was acquitted. We emphasized that no specific "elements" are at issue under section 190.3, factor (b), except that some violent criminal offense must exist. (At pp. 754-755.) We are, therefore, unpersuaded by defendant's contention that he was prejudiced by the introduction of evidence that might have established an element of a charge that he never faced in the prior trial and that was never argued in the present one.

▪▪▪ We have likewise rejected identical double jeopardy claims in earlier decisions. In *People* v. *Visciotti* (1992) 2 Cal.4th 1 [5 Cal.Rptr.2d 495, 825 P.2d 388], we reasoned that "[t]he presentation of evidence of past criminal conduct at a sentencing hearing does not place the defendant in jeopardy with respect to the past offenses. He is not on trial for the past offense, is not subject to conviction or punishment for the past offense, and may not claim either speedy trial or double jeopardy protection against introduction of such evidence. [Citation.]" (*Id.* at p. 71; see also *People* v. *Douglas* (1990) 50 Cal.3d 468, 528 [268 Cal.Rptr. 126, 788 P.2d 640]; *People* v. *Melton, supra,* 44 Cal.3d at pp. 754-755.)

Defendant cites *People* v. *Sheldon* (1989) 48 Cal.3d 935 [258 Cal.Rptr. 242, 771 P.2d 1330] (*Sheldon*) and *Grady* v. *Corbin* (1990) 495 U.S. 508 [109 L.Ed.2d 548, 110 S.Ct. 2084] (*Corbin*), in support of his contention that admission of the evidence underlying his prior manslaughter conviction violated double jeopardy principles. Both cases are distinguishable from this one. In *Sheldon*, a case involving a straightforward application of section 190.3, we held that the trial court erred in admitting evidence of an attempted murder of which defendant had been *formally* acquitted, and in instructing the jury on attempted murder; we rejected the People's argument that the evidence of attempted murder might have established a lesser crime. (*Sheldon, supra,* 48 Cal.3d at p. 951.) In *Corbin*, the high court held that the double jeopardy clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has

already been prosecuted. (*Corbin, supra,* 495 U.S. at p. 510 [109 L.Ed.2d at p. 557].)[13] As defendant was not prosecuted in the penalty phase for the conduct on which his prior conviction was predicated (*People v. Visciotti, supra,* 2 Cal.4th at p. 71), *Corbin* has no application to this case.

■ Defendant also complains that the prosecution was able to "hone" the evidence underlying the manslaughter conviction, and to present only that most favorable to the prosecution (the fact that the victim was shot in the back of the head and the back), while omitting the weaker aspects of the case (the assertedly suspect credibility of unidentified prosecution witnesses). However, defendant cites no authority requiring the prosecution to present all the evidence it adduced in the prior trial when it seeks to establish a prior violent crime under section 190.3, factor (b), and we are aware of none. In any event, defendant presented evidence tending to extenuate the gravity of the killing of Vernon Hood. We see no deprivation of due process on these facts, and defendant has not established that the procedures employed in this case offend the Eighth Amendment's aim of protecting reliability in capital sentencing.

■ Defendant contends that in light of *People v. Guerrero* (1988) 44 Cal.3d 343 [243 Cal.Rptr. 688, 748 P.2d 1150] (*Guerrero*), admission of evidence of the prior manslaughter conviction denied him equal protection of the law and reliability in capital sentencing procedures. *Guerrero* dealt with the extent to which the record of a prior conviction may be introduced in support of a sentence enhancement under sections 667 and 1192.7; we concluded that the trier of fact may look to the entire record of the conviction to determine the nature of the prior offense, but may not relitigate the facts behind the record. (*People v. Guerrero, supra,* 44 Cal.3d at pp. 348-355.) In *People v. McDowell* (1988) 46 Cal.3d 551, 568 [250 Cal.Rptr. 530, 758 P.2d 1060], however, we distinguished sentence enhancement cases from penalty determinations in capital cases. Although we did not expressly mention *Guerrero,* we reasoned that in ordinary sentence enhancement cases it is the fact of the conviction itself that authorizes the enhancement, as opposed to the aggravating circumstances surrounding the offense. (*McDowell, supra,* 46 Cal.3d at p. 568.) We also observed that although the enhancement statutes authorize only evidence of the crime rather than the conduct of the defendant, section 190.3 focuses on defendant's conduct. (*Ibid.*) Capital defendants are thus situated differently from defendants subject to sentence enhancements, and no equal protection violation occurs when they are

---

[13]Although the scope of the *Corbin* holding is somewhat uncertain (see *United States v. Felix* (1992) __ U.S. __ [118 L.Ed.2d 25, 112 S.Ct. 1377]), defendant cites no federal authority showing that his claim of double jeopardy potentially has merit.

treated differently. Nor was defendant denied due process or reliable sentencing procedures by the introduction of evidence of the circumstances of defendant's prior crimes.[14]

For all of the preceding reasons, introduction of evidence pertaining to defendant's prior manslaughter conviction complied with section 190.3 and state and federal constitutional guarantees.

■ Defendant contends that the trial court erred in admitting evidence that he spent five years in prison on the manslaughter conviction and that he committed the crimes of which he was convicted in the present case six days after his release from San Quentin. That evidence, he argues, relates to no statutory aggravating factor and should therefore have been excluded. (*People v. Boyd* (1985) 38 Cal.3d 762, 771-776 [215 Cal.Rptr. 1, 700 P.2d 782].) The People contend he waived the issue by not objecting on this ground at trial. Our review of the record discloses that defense counsel objected only to admission of the facts underlying the manslaughter conviction, and to that only on the grounds of collateral estoppel and undue consumption of time under Evidence Code section 352. Consequently, he has failed to preserve the issue for review. (*People v. Benson* (1990) 52 Cal.3d 754, 788 [276 Cal.Rptr. 827, 802 P.2d 330].)

■ Even if we were to reach the merits of the issue, however, we would find no error. The prosecutor argued the aggravating nature of these facts in the context of the circumstances of the present crimes. (§ 190.3, factor (a); see *People v. Turner* (1990) 50 Cal.3d 668, 713-714 [268 Cal.Rptr. 706, 789 P.2d 887].) That defendant committed these crimes only six days after his release from prison on a prior homicide conviction supports the inference that incarceration had failed to change his violent character. The jury could properly consider this inference in determining his sentence. (*People v. Turner, supra*, 50 Cal.3d at p. 714. )[15]

---

[14]Defendant also cites *Taylor v. United States* (1990) 495 U.S. 575, 599-600 [109 L.Ed.2d 607, 627-628, 110 S.Ct. 2143], for the proposition that the evidence underlying his manslaughter conviction should have been excluded. That case, however, dealt with the meaning of "burglary" as used in a sentence enhancement provision contained in the Anti-Drug Abuse Act of 1986 (18 U.S.C. § 924(e).) It has no application to this case.

[15]Defendant suggests that the rule in *People v. Turner, supra*, conflicts with our decisions in *People v. Boyde* (1988) 46 Cal.3d 212, 249 [250 Cal.Rptr. 83, 758 P.2d 25], affirmed *Boyde v. California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190]; *People v. Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052]; and *People v. Rodriguez* (1986) 42 Cal.3d 730, 791 [230 Cal.Rptr. 667, 726 P.2d 113]. Those cases reiterated the rule that it is error to admit the testimony of police and parole officers not bearing on a statutory aggravating factor. We find no conflict. As discussed above, the testimony of defendant's parole officer, Clyde

### 2. *Unadjudicated Battery*

■ As noted above, the prosecution presented evidence that defendant committed a battery in an altercation following a traffic accident on July 19, 1980. (§ 243.) The trial court overruled a defense objection to the testimony on the ground that the limitations period for battery had expired. Defendant contends this ruling was incorrect.

We have repeatedly rejected this contention, as defendant acknowledges. (*People* v. *Heishman* (1988) 45 Cal.3d 147, 192 [246 Cal.Rptr. 673, 753 P.2d 629]; accord, *People* v. *Jennings* (1988) 46 Cal.3d 963, 981-982 [251 Cal.Rptr. 278, 760 P.2d 475].) Defendant argues that decisions of the United States Supreme Court stressing the need for reliability in capital sentencing procedures dictate a different conclusion. (*Johnson* v. *Mississippi* (1988) 486 U.S. 578 [100 L.Ed.2d 575, 108 S.Ct. 1981]; *Gardner* v. *Florida* (1977) 430 U.S. 349 [51 L.Ed.2d 393, 97 S.Ct. 1197].) Contrary to defendant's claim, the Eighth Amendment's aim of ensuring the reliability of penalty determinations is furthered, not frustrated, by the admission of his prior violent criminal activity. (See *People* v. *Douglas, supra,* 50 Cal.3d 468, 529-530.) Moreover, the evidence was not particularly stale, the battery having occurred only seven years before trial. Defendant does not suggest specific ways in which the passage of time may have prejudiced his ability to respond to it. (Cf. *ibid.*) The trial court did not err in admitting evidence of the unadjudicated battery.

### 3. *Miscellaneous Contentions*

■ Defendant makes the following additional arguments in support of his claim that other-crimes evidence should not have been introduced.

a. He contends that having the same jury decide both guilt and penalty phases violates rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments. We rejected this argument in *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480], and in subsequent cases.

b. Defendant urges the penalty determination is unreliable because the sentencing jury was never provided with facts from which it could fairly determine that defendant was the person who committed the voluntary manslaughter of Vernon Hood. The argument lacks merit; the prosecution introduced into evidence certified copies of the verdict and abstract

---

Moore, was relevant to show the circumstances of the crime. (*People* v. *Turner, supra,* 50 Cal.3d at p. 714; § 190.3, factor (a).)

Defendant also argues that evidence of the sentence he received for killing Vernon Hood focused the jury's penalty calculation not on the capital crime but on whether he was sufficiently punished for the Hood killing. The point is purely speculative and meritless.

of judgment in the prior trial. Moreover, defendant did not contest killing Vernon Hood, but presented mitigating evidence indicating he did so only after Hood beat defendant's sister and her children.

c. Defendant contends the penalty determination violates the Sixth, Eighth, and Fourteenth Amendments because the jury was never instructed that before considering the manslaughter and battery as aggravating evidence it must agree unanimously that defendant committed those crimes. We have rejected this contention in numerous cases. (*People* v. *Taylor* (1990) 52 Cal.3d 719, 749 [276 Cal.Rptr. 391, 801 P.2d 1142].)

## B. *Prosecutorial Argument*

■ Defendant makes several claims of error based on the prosecutor's argument at the close of the penalty phase. He failed to preserve the claims by timely and specific objection. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 891 [277 Cal.Rptr. 122, 802 P.2d 906].) Even if he had made appropriate objections at trial, however, his claims would fail.

### 1. *Booth-Gathers Error*

■ First, defendant contends that the prosecutor impermissibly urged the jury to impose a death sentence based on the characteristics of the victim and the loss suffered by the victim's family, citing *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] and *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207]. Referring to the testimony of defendant's mother on his behalf, the prosecutor said, "[B]efore you give [*sic*] undue love of a mother for her son, then you may want to listen to that tape of July 7th again so you can be reminded of the love that a daughter had for her mother . . . . [¶] [W]e have to think about the resident who [*sic*] he killed and the family who [*sic*] the perpetrator orphaned." The tape recording to which the prosecutor referred consisted of Angela Womble's interview with Detective Shipp, in which Angela, weeping, said, "I want to finish this, because I want this to stick in court. I want them to pay for what they done to my family."

During the pendency of this appeal, both *Booth* v. *Maryland, supra,* 482 U.S. 496 and *South Carolina* v. *Gathers, supra,* 490 U.S. 805 were largely overruled. (*Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597].) We have since held that the injury inflicted by the defendant—including the impact of the crime on the family of the victim—is one of the circumstances of the crime, evidence of which is admissible under section 190.3, factor (a). (See generally *People* v. *Edwards* (1991) 54 Cal.3d 787,

833-836 [1 Cal.Rptr.2d 696, 819 P.2d 436].) However, as defendant points out, *Payne* did not address *Booth*'s holding that admission of a victim's family member's characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment; as the high court noted, no such evidence was presented in *Payne*. (*Payne* v. *Tennessee*, *supra*, 501 U.S. at p. ___ [115 L.Ed.2d 720 at p. 739, fn. 2].) Defendant argues that Angela Womble's statement and the prosecutor's brief reference to it are of the type of evidence and comment forbidden by the viable portion of *Booth*. We disagree. Angela expressed no characterization or opinion of the crime, the defendant, or the appropriate sentence; she merely expressed the desire that the perpetrators pay for their wrongdoing. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1062 [5 Cal.Rptr.2d 230, 824 P.2d 1277] [assessment of, and reaction to, the crime from the victim's standpoint is highly relevant to consideration of the circumstances of the crime].) Even if the comments were in some way improper, we do not believe they could have had any appreciable effect on the jury's determination, in light of the callousness of defendant's crime.

### 2. *Boyd Error*

 Defendant next contends the prosecutor invited the jury to impose the death penalty based on nonstatutory aggravating factors, in violation of the rule of *People v. Boyd*, *supra*, 38 Cal.3d 762, 773. His objection is waived for failure to make a specific objection and request for admonition. (*People v. Green*, *supra*, 27 Cal.3d 1, 27; see *People v. Daniels*, *supra*, 52 Cal.3d 815, 891.) Even if defendant had preserved the objection, however, we would find it meritless.

Defendant cites two portions of the prosecutor's argument as improper under *Boyd*. The prosecutor argued: "How do you make that kind of a decision [to return a verdict of death]? You've never—there's nobody in this courtroom, I would submit to you, who has made that decision before. How do you do that? What experience do you draw upon to make a decision of that magnitude? [¶] It's a command decision. You know what I mean by a command decision? It's a decision that not even senators of the United States are empowered to make. It's the decision of the Commander in Chief charged with responsibility of protecting a country from enemies without has the power to make. It's a decision that you, ladies and gentlemen, as the . . . protectors of society from enemies within have to make."

Later, the prosecutor argued: "And now we have to ask ourselves, what do we do about it and why? You could easily say, 'Well, I'm not threatened. I'm not going to state prison.' None of you are going to state prison. He's going

to state prison and at minimum for the rest of his life without possibility of parole, not going to kill any of you again. Not going to kill anybody on the outside. . . . [¶] He's inside. Minimum he's inside, not going to kill any of you, not going to kill anybody else who's living in society generally. Whether or not he kills anybody in state prison, time would only tell, but that's not really the point. [¶] The fact of the matter is, and this is something I can just submit to you for your own consideration, the purpose of a death penalty is punishment. Punishment. [¶] There are crimes so aggravating, there are conditions so aggravating that you say, 'No, supreme punishment is all that's left to us. It's all we have left.' "

Defendant complains that the quoted portions of the prosecutor's argument were improper in that they suggested that each juror's independent decision should be supplanted by perceived societal needs. The jury's determination, he contends, was based on fear and its interest in community protection rather than on individualized sentencing as required by the Eighth Amendment.

In support of his contention, he cites *Brooks* v. *Kemp* (11th Cir. 1985) 762 F.2d 1383, vacated on other grounds 478 U.S. 1016 (1985) [92 L.Ed.2d 732, 106 S.Ct. 3425], reinstated 809 F.2d 700 (11th Cir. 1987) (*Brooks*). In *Brooks*, the prosecutor embarked on an extended comparison of a penalty phase jury with soldiers in war, defendant being one of the enemy, the criminal element in society. (*Id.* at p. 1396.) The Court of Appeals for the Eleventh Circuit disapproved the argument, reasoning that the jury's discretionary function is unlike that of soldiers who are ordered to kill enemies. (*Id.* at p. 1412.)

In the present case, the prosecutor's military metaphor was to exactly the opposite effect: he argued that the jury's role was to make a "command decision," one that only the commander-in-chief can make. Thus, the argument in no way "undermine[d] the crucial discretionary element required by the Eighth Amendment." (762 F.2d at p. 1413.) Although the prosecutor labelled defendant with the epithet "enemy," we—like the Court of Appeals in *Brooks*—"do not seriously fault its application to one whose crime is 'so grievous an affront to humanity that the only adequate response may be the penalty of death.' (*Gregg* v. *Georgia* [(1976)] 428 U.S. [153,] 184 [49 L.Ed.2d 859, 880, 96 S.Ct. 2909]." (*Brooks* v. *Kemp, supra,* 762 F.2d at p. 1412.) The remark was isolated and noninflammatory, and does not appear to have been aimed at arousing the passion or prejudice of the jury. (*People* v. *Pensinger, supra,* 52 Cal.3d 1210, 1251.) To the extent that the prosecutor was commenting on defendant's future dangerousness, the argument was a permissible inference from the evidence. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 288 [221 Cal.Rptr. 794, 710 P.2d 861].)

■ Defendant complains that the prosecutor's argument regarding future dangerousness violated due process and section 190.3's requirement that defendant be given advance notice of aggravating evidence. He also contends that, had he known the prosecutor would present this "nonstatutory aggravation" at closing argument, he would have attempted to dispute it through the presentation of mitigating evidence during the defense case. Defendant's basic premise is faulty; the prosecutor's argument did not constitute evidence of which notice was required. Rather, it was an inference from properly noticed and admitted evidence. Moreover, the import of the argument was that, regardless of the fact that defendant's imprisonment for life without possibility of parole would adequately protect the community, the retributive aims of capital sentencing would best be served by the imposition of the death penalty in this case.

### 3. *Claims of Caldwell and Brown Error*

■ Defendant contends that the prosecutor gave the jury a misleading and erroneous view of its sentencing responsibilities during his penalty phase closing argument. He cites the following remarks: "You do have guidance. You do have experience to draw upon. You heard it for the first time this afternoon. It's called the law and it has evolved over time and in its evolution it has given you something. It has given you factors. It has given you guidelines to show you the direction you should take in determining whether or not the death penalty is appropriate under the circumstances of this case and it is no place other than the law I submit to you, that any of you, any of us are going to be able to find the answer to the question, is the death penalty the only appropriate sentence in this case?" He also cites the following statement, with which the prosecutor ended his argument: "I do know this, actions speak louder than words. I do know that you have a command decision, and it's time to take action, and I, in summation, can only submit to you, because that's what the law does, that there is but one appropriate sentence in the facts and circumstances of this case, and that is the imposition of the death penalty."

Defendant contends the cited remarks constitute error under *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] (*Caldwell*) because they urged the jury to rely on the "law" in reaching a sentencing decision. The argument is without merit. The prosecutor did no more than urge the jury to follow the law, as they were bound to do. Unlike *Caldwell*, *supra*, 472 U.S. at page 325 [86 L.Ed.2d at page 237], the prosecutor never suggested that the jury's decision was not final and that its decision would be reviewed. (*People* v. *Clark* (1992) 3 Cal.4th 41, 167 [10 Cal.Rptr.2d 554, 833 P.2d 561].) Consequently, no *Caldwell* error is shown.

Defendant also appears to contend that the cited portions of the prosecutor's argument ran afoul of the rule in *People v. Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440]. He fails to specify how the argument, standing alone, violates *Brown*. Nonetheless, he argues that the *Brown* error contained in the argument was "exacerbated" by erroneous instructions.

The trial court read the following modified version of CALJIC former No. 8.84.2 to the jury: "It is now your duty to determine which of the two penalties, death or confinement in state prison for life without possibility of parole shall be imposed on the defendant. After having heard all the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. . . . [¶] In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. *If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you may, but need not, impose a sentence of death unless you are persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without possibility of parole.* If you conclude that the mitigating factors are equal to or outweigh the aggravating you must return a verdict of confinement in the state prison for life without possibility of parole."

The trial court adapted the foregoing instruction from the standard CALJIC instruction, after discussing with counsel the effect of our decision in *Brown, supra,* 40 Cal.3d 512. Defendant rightly notes that the italicized portion of this instruction is confusing. To make logical sense of the instruction, the jury had to draw certain inferences about the extent of its discretion.

Defendant contends that a reasonable juror would most likely have understood the instruction to mean that if the juror (a) concluded that the aggravating circumstances outweighed the mitigating circumstances and (b) was persuaded that the aggravating circumstances were so substantial in comparison with the mitigating circumstances that death rather than life without possibility of parole was warranted, then the juror was required to return a

death verdict. If, however, the juror concluded that aggravating circumstances outweighed mitigating circumstances, but was *not* persuaded that the aggravating circumstances were so substantial that death rather than life without possibility of parole was warranted, the juror might, but was not required to, impose a sentence of death.

This interpretation, defendant contends, does not accurately state applicable law and violates the rule of *People* v. *Brown, supra*, 40 Cal.3d 512. The instruction was erroneous, defendant reasons, because it authorized the jury to return a verdict of death whenever aggravation was deemed to outweigh mitigation, even when the jury was not persuaded that death was the appropriate punishment. He contends the jury likely would have concluded that the weighing process was supposed to be an "objective" one, not the normative, moral, individualized one required by *Brown*.

Theoretically, it is possible to read the italicized sentence, in isolation, to imply such a proposition. However, we review an assertedly erroneous instruction not in isolation, but in the context of the entire charge. (*People* v. *Haskett* (1990) 52 Cal.3d 210, 235 [276 Cal.Rptr. 80, 801 P.2d 323].) Keeping in mind this principle of construction, we have considered the instructions as a whole. We conclude that the instructions adequately conveyed that the weighing process is merely a metaphor for the juror's personal determination that death is the appropriate penalty under all of the circumstances. (*People* v. *Hayes* (1990) 52 Cal.3d 577, 642 [276 Cal. Rptr. 874, 802 P.2d 376].)

First, it must be noted that the challenged portion of the instruction emphasized the discretionary nature of the jury's penalty determination. The jury was told that if it found that aggravating circumstances outweighed mitigating circumstances, it "may, but need not," impose a sentence of death. True, the instruction may have been understood to imply that the jury possessed less discretion in the event it found that aggravating circumstances were so substantial in comparison with the mitigating circumstances that death, rather than life without possibility of parole, was warranted. But in that sense the instruction was merely tautological: it directed the jury to return a verdict of death if it found death to be warranted. It did not thereby compel a death verdict in contravention of *Brown, supra*, 40 Cal.3d 512, or the statute. We cannot accept defendant's complementary contention that the instruction invited the jury to return a verdict of death even though it did not believe death was warranted, merely because aggravating circumstances outweighed mitigating. There is no reasonable likelihood that the jury would have thought it could return a verdict of death if it did not believe that penalty was appropriate. (*People* v. *Clair, supra*, 2 Cal.4th at p. 663.)

Other instructions ensured that the jury understood the normative, discretionary nature of its decision. The jury was instructed that the weighing process is not a "mere mechanical counting of factors on each side of an imaginary scale." The jury was also instructed that it was "free to assign whatever moral or sympathetic value [it] deem[ed] appropriate to each and all of the various factors you are permitted to consider." Thus, there was no reasonable likelihood that the jury was misled by the semantically flawed instruction.

Moreover, any ambiguity was not exploited by the prosecutor in argument. Both defense counsel and the district attorney emphasized the serious, discretionary nature of the determination and the necessity that the jurors be persuaded that death was the only appropriate penalty before they returned the corresponding verdict.

Defendant also contends that the instruction was unconstitutionally vague, especially in its use of the term "substantial." We recently rejected a similar claim in *People* v. *Breaux* (1991) 1 Cal.4th 281, 315 [3 Cal.Rptr.2d 81, 821 P.2d 585], and defendant does not persuade us that we erred.

C. *Refusal to Give Lingering Doubt Instruction*

Defendant asked the trial court to instruct the jury as follows: "It is appropriate for you to consider in mitigation any lingering doubts you may have concerning defendant's guilt. Lingering doubt is defined as that state of mind between a reasonable doubt and beyond all possible doubt."

On defendant's initial request, the trial court declined to give the proffered instruction, believing it to be unsupported in law. On his renewed request, the court refused it as esentially unsupported in fact. The trial court did, however, instruct the jury to consider "[a]ny other circumstances which extenuates [*sic*] the gravity of the crime even though it is not a legal excuse for the crime. [¶] And, any sympathetic or other aspect of the defendant's character or record as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. [¶] You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." (See § 190.3, factor (k).)

Despite the trial court's refusal of the requested instruction, defense counsel argued the issue of lingering doubt to the jury, immediately after discussing section 190.3, factor (k). ▆ Defendant now urges that the trial court's refusal to give the instruction requires reversal of his conviction. We disagree.

A defendant has no federal or state constitutional right to have the penalty phase jury instructed to consider any residual doubt about defendant's guilt. (*Franklin* v. *Lynaugh* (1988) 487 U.S. 164, 173-174 [101 L.Ed.2d 155, 165, 108 S.Ct. 2320]; *People* v. *Cox* (1991) 53 Cal.3d 618, 677-678 [280 Cal.Rptr. 692, 809 P.2d 351].) This is not to say that the jury's consideration of any such doubt is improper; defendant may urge his possible innocence to the jury as a factor in mitigation. (§ 190.3, factors (a), (k); *People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168 [80 Cal.Rptr. 920, 459 P.2d 248]; *People* v. *Terry* (1964) 61 Cal.2d 137, 145-147 [37 Cal.Rptr. 605, 390 P.2d 381].) Indeed, defense counsel did so in final argument in this case. Defendant argues that the right to argue his possible innocence is "but a hollow formality" if instructions supporting the theory of the defense are not given. (Cf. *Penry* v. *Lynaugh* (1989) 492 U.S. 302, 328 [106 L.Ed.2d 256, 284, 109 S.Ct. 2934] [finding Eighth Amendment error in failure to instruct jury that it could consider and give effect to mitigating evidence of defendant's mental retardation and abused background].) Here, this requirement of supporting instructions was met by the expanded factor (k) instruction. (*People* v. *Price* (1991) 1 Cal.4th 324, 488 [3 Cal.Rptr.2d 106, 821 P.2d 610].) The trial court did not err in declining to give a more specific instruction on lingering doubt as a mitigating circumstance. (*Ibid.*)

### D. *Jury Coercion*

 Defendant contends the trial court erred in failing to grant a mistrial when, during its penalty phase deliberations, the jury declared itself at an impasse. He contends that the trial court further erred in not responding to a note from one of the jurors or inquiring into the possibility of jury misconduct. Defendant does not persuade us.

At 10:50 a.m. on the third day of its deliberations, the jury sent the trial court a note, signed by the foreman, that read, "We have come to an impasse and have not been able to reach a unanimous verdict." The trial court advised both the prosecutor and defense counsel that it planned to call in the jury to ask whether there was anything the court could do to assist them. The trial court also proposed to ask the jury to state what the split was without disclosing which way they stood on the issues, and to determine whether the jury had taken a number of votes, whether the votes had changed, and similar matters. When asked whether they had any suggestions or comments, both counsel responded in the negative.

In the presence of the entire jury, the trial court asked the foreman the numerical split of the jury, stating "I am not interested . . . in your telling me how many jurors stand for what particular proposition." The foreman

answered that on the last ballot, taken at 10:40 that morning, the jury stood 11 to 1; that on the immediately preceding ballot, taken about 10:05 that morning, it had voted 7 to 5; and that on the ballot before that one, taken the previous morning, the jury had split 10 to 2. Asked whether the trial court could do anything to assist the jury, the foreman said no. The trial court then asked each of the jurors whether he or she believed further deliberations could bring about a verdict. Nine believed the jury was hopelessly deadlocked. Juror Dodge said "I'm torn whether or not it's totally deadlocked." Juror Metz said "I don't think it's totally deadlocked. I think there's more hope." Juror Abernathy said he thought the jury was close to a deadlock, but that "maybe there's a chance."

The trial judge candidly told the jurors he had two possible responses to what they had told him: either discharge the jury or ask them to recommence deliberations. The judge noted it is not unusual for juries reporting a deadlock, given additional time for deliberations, to reach a verdict, although the opposite result is also not unusual. Based on his observations and the jurors' responses, the judge decided to ask the jury to recommence deliberations. The jury then recessed for lunch, agreeing to return at 1 p.m.

During the lunch break, the bailiff informed the trial court that Juror Metz had given him a note that read, "Bill, I need to talk to the judge. Mary." The trial court discussed the note with the prosecutor and defense counsel. Both attorneys suggested the court ought to talk privately with Juror Metz about her concerns, with only the court reporter present. The trial court countered by proposing that, before implementing their suggestions, it would have the bailiff provide Juror Metz with a note asking her to write down the general nature of the concern so that the trial court could determine whether it would be proper to talk with her about it. Both counsel agreed to the court's alternative suggestion.

A few minutes before 1 p.m., the trial court sent Juror Metz a note that read, "Mary, would you please write out the general matter you wish to speak to me about so I can decide whether it is legally permissible for me to talk with you." At 1:05 p.m., Juror Metz sent back a note that read, "Judge, I feel 11 of us have come to a decision, and one has not. It is not only myself but others feel this one person does not believe or ever did in the death penalty. Can she be disqualified?" After conferring with counsel, the trial court sent back a note that read, "Mary, it is not legally permissible for me to talk with you about your concerns at this time. You are requested and ordered to keep your communications with me to yourself."

The jury continued its deliberations that afternoon. The following morning, the jury requested a readback of the testimony of Ketcia Hawkins and Zina Sims. The next day, at 9:45 a.m., the jury returned its verdict.

Defendant contends that the trial court's inquiry as to the numerical split in the jury's last three ballots was coercive. Defendant acknowledges that a trial court has discretion to determine whether or not there is a reasonable probability that the jurors will be able to agree (§ 1140; *People* v. *Rodriguez, supra,* 42 Cal.3d at p. 775), and correctly observes that the court must exercise its power without coercing the jury, to avoid displacing the jury's independent judgment " 'in favor of considerations of compromise and expediency.' " (*Ibid.,* quoting *People* v. *Carter* (1968) 68 Cal.2d 810, 817 [69 Cal.Rptr. 297, 442 P.2d 353].) He notes that the United States Supreme Court, as an exercise of its supervisory power over federal courts, has prohibited numerical inquiry into jury division. (*Brasfield* v. *United States* (1926) 272 U.S. 448, 450 [71 L.Ed. 345, 346, 47 S.Ct. 135].)

Although he concedes the *Brasfield* rule is not a matter of federal constitutional law (*Lowenfeld* v. *Phelps* (1988) 484 U.S. 231, 239-240 [98 L.Ed.2d 568, 578, 108 S.Ct. 546]), he urges that in the circumstances of this case the trial court's inquiry violated his federal constitutional rights to a fair trial and an impartial jury. (*Locks* v. *Sumner* (9th Cir. 1983) 703 F.2d 403, 406.) Specifically, defendant suggests the inquiry motivated Juror Metz's note disclosing that 11 jurors favored a death verdict, and was thus coercive, albeit inadvertently so. We infer that the trial court's inquiry in fact motivated Juror Metz's disclosure. Even so, however, this circumstance does not persuade us to depart from our many decisions allowing inquiry into a jury's numerical split. (*People* v. *Breaux, supra,* 1 Cal.4th 281, 319; *People* v. *Morris, supra,* 53 Cal.3d 152, 226-227; *People* v. *Rodriguez, supra,* 42 Cal.3d at p. 776.) Nothing in the trial court's comments remotely can be construed as implying a desire that the holdout juror capitulate to the majority.

Defendant argues that by failing to indicate that Juror Metz's concerns were inappropriate, but instead allowing further deliberation by a jury which it then knew to be leaning in favor of a death verdict, the trial court effectively conveyed to Juror Metz and other jurors that their concerns could not be remedied by law and that they would have to take matters into their own hands and deal with the holdout juror in the manner they thought best—thus coercively affecting the jurors' deliberations. Defendant's concerns are entirely speculative. We must presume that Juror Metz followed the trial court's admonition not to reveal their communications to the other jurors. (*People* v. *Frank* (1990) 51 Cal.3d 718, 728 [274 Cal.Rptr. 372, 798 P.2d 1215].) Nor can we agree that by requiring the jurors to continue deliberating, the trial court "validated" the views of jurors favoring the death penalty. After announcing the deadlock, the jury continued to deliberate for a day and a half (during which time it requested and heard a readback of

testimony) before it reached its verdict. The jury's continued deliberations indicate that the penalty determination was the product of its own reasoning processes, not judicial coercion. (See *People* v. *Rodriguez, supra,* 42 Cal.3d at p. 775.)

▇ Defendant further contends the trial court erred when it failed to inquire into possible jury misconduct after reading Juror Metz's note. Defendant interprets the note as hinting misconduct might be occurring: some of the jurors may have been discussing the case in the absence of the other jurors, and Juror Metz or others may have been coercing the dissenting juror into abandoning her position. Both assertions are entirely speculative and without foundation in the record. In any event, jurors can be expected to disagree, even vehemently, and to attempt to persuade disagreeing fellow jurors by strenuous and sometimes heated means. To probe as defendant suggests, in the absence of considerably more cogent evidence of coercion, would " 'deprive the jury room of its inherent quality of free expression.' " (*People* v. *Keenan* (1988) 46 Cal.3d 478, 541 [250 Cal.Rptr. 550, 758 P.2d 1081], quoting *People* v. *Orchard* (1971) 17 Cal.App.3d 568, 574 [95 Cal.Rptr. 66].) Consequently, the trial court was not required to make the inquiry for which defendant now argues. Moreover, any such inquiry could in itself have risked pressuring the dissenting juror to conform her vote to that of the majority. (See *People* v. *Keenan, supra,* 46 Cal.3d at p. 533.) Defense counsel presumably was aware of the potential for such an outcome, and for that reason might have declined to request such an inquiry.

▇ Defendant also contends that, on receiving Juror Metz's note, the court had a duty to determine whether the jurors' statements that the deadlock might be broken were based on a misunderstanding of the court's offer to assist, i.e., that the dissenting juror could be disqualified. That contention is easily disposed of: there is no evidence that any juror other than Ms. Metz wondered whether the dissenting juror could be removed, and after reading the trial court's reply Juror Metz herself could not reasonably have entertained such a belief.

### E. *Cumulative Effect of Errors*

Defendant contends that the cumulative effect of errors during the trial requires reversal of the penalty. Having found in the penalty phase no error of law, and in the guilt phase only the minor errors described above, we disagree.

### F. *Constitutionality of 1978 Death Penalty Law*

Defendant raises a variety of challenges to the constitutionality of the 1978 death penalty law. He contends the statute is unconstitutional because

it fails to provide for: (1) written findings as to aggravating factors; (2) proof beyond a reasonable doubt of aggravating factors; (3) jury unanimity as to aggravating factors; (4) a finding that aggravating factors outweigh mitigating factors beyond a reasonable doubt; (5) a finding that death is the appropriate punishment beyond a reasonable doubt; (6) a "procedure to enable a reviewing court to evaluate meaningfully the sentencer's decision"; and (7) a presumption that life without possibility of parole is the appropriate sentence. He also contends that the statute invites arbitrariness and capriciousness by failing to designate which sentencing factors are aggravating and which are mitigating, by failing to require that the jury not consider inapplicable mitigating circumstances, and by permitting allegations of unadjudicated criminal activity to be used as a basis for imposing death. As defendant acknowledges, we have rejected each of his contentions in numerous decisions upholding the constitutionality of the law. (*People v. Clair, supra*, 2 Cal.4th at p. 691.)

## CASE NO. S012228

■■■ After judgment was entered in defendant's capital trial and his automatic appeal was taken, defendant moved the trial court for an order for preservation of materials offered or received into evidence in the capital trial, materials offered or received into evidence in the earlier trial that resulted in defendant's conviction for voluntary manslaughter, and "all law enforcement reports, notes, tape recordings, or other memorializations or fruits of law enforcement investigation or witness interviews, all scientific or forensic reports or notes and underlying documentation, all photographs, and all other items of evidence" related to the capital trial or to the prior manslaughter trial. The trial court denied the motion, concluding it lacked jurisdiction due to the automatic appeal pending in this court.

Defendant unsuccessfully petitioned this court for a writ of mandate contesting the jurisdictional determination. He then filed, in the Court of Appeal for the First Appellate District, a notice of appeal from the trial court's order denying his motion. We transferred that appeal to this court (Cal. Rules of Court, rule 20(a)), and consolidated it with defendant's automatic appeal after ordering that the materials sought be preserved pending the disposition of the appeal in No. 12228.

We shall conclude that the trial court's postjudgment order did not affect defendant's substantial rights, and that the purported appeal must therefore be dismissed. (§ 1237, subd. (b).)

Relying primarily on Code of Civil Procedure section 916, subdivision (a), defendant argues that the trial court erred in concluding it lacked

jurisdiction. ■ In relevant part, the statute provides that the perfecting of an appeal stays proceedings in the trial court on the judgment appealed from, or on the matters embraced in it or affected by it, but "the trial court may proceed upon any other matter embraced in the action and not affected by the judgment or order." (Code Civ. Proc., § 916, subd. (a).) Thus, during the pendency of an appeal, the trial court loses jurisdiction to do anything in connection with the cause that may affect the judgment, but retains certain powers over the parties and incidental aspects of the cause, such as procedural steps in connection with preparation and correction of the record. (6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Appeal, §§ 3135, 3136, pp. 3874-3876; *People* v. *Sonoqui* (1934) 1 Cal.2d 364, 366 [35 P.2d 123].) ■ Defendant seems implicitly to equate preservation of the requested materials with preparation of the record (proceedings for which were ongoing in the trial court when he made his motion for preservation).

As further authority for his position, defendant cites several appellate decisions recognizing trial court jurisdiction to enter particular types of postjudgment orders. (*Hays* v. *Superior Court* (1940) 16 Cal.2d 260, 266-268 [105 P.2d 975] (*Hays*) [holding that trial court had jurisdiction, pursuant to former Code Civ. Proc., § 2021, to order postponement of deposition during pendency of appeal from dismissal of civil complaint]; *In re Ketchel* (1968) 68 Cal.2d 397, 399-402 [66 Cal.Rptr. 881, 438 P.2d 625] (*Ketchel*) [holding that trial court had jurisdiction to act on petition for writ of habeas corpus during pendency of automatic appeal from judgment of death when petition sought to prevent unnecessary interference by prison officials with inmate's right to assistance of counsel by their refusal to allow psychiatrist to interview inmate]; *Wisely* v. *Superior Court* (1985) 175 Cal.App.3d 267, 269-270 [220 Cal.Rptr. 893] (*Wisely*) [holding that trial court had jurisdiction over discovery requests during pendency of appeal from grant of motion for new trial in capital case].) Our review of these decisions persuades us that each is distinguishable in crucial respects from the present case. *Hays, supra,* implicated a discovery statute giving litigants a broad right to take depositions at any time after service of summons or defendant's appearance (see Code Civ. Proc., former § 2021); no comparable discovery statute exists in the present context. The import of our holding in *Ketchel, supra,* was that the writ of habeas corpus lies to prevent official interference, except as necessary to ensure prison security, with an inmate's right of access to his counsel; no similar issue exists in this case. And the decision in *Wisely, supra,* depends heavily on the fact that a new penalty trial was anticipated when defendant initiated the challenged postjudgment discovery; that circumstance is absent from this case.

In requesting an order for preservation of the fruits of law enforcement and forensic investigations in the capital case and the prior manslaughter

case, and of items offered or received into evidence in the prior manslaughter trial, defendant's motion essentially sought anticipatory postjudgment discovery. We have recently held that such discovery requests fall outside the trial court's jurisdiction when unconnected with any criminal proceeding then pending before it. (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1256-1258 [275 Cal.Rptr. 729, 800 P.2d 1159]; see also *People* v. *Ainsworth* (1990) 217 Cal.App.3d 247, 250-255 [266 Cal.Rptr. 175].) The record correction proceedings pending before the trial court at the time of defendant's motion are not the type of proceeding that can support a request for discovery. Thus, the trial court did not err in concluding it lacked jurisdiction to grant the motion for preservation of the investigative materials and the evidentiary items relating to the prior manslaughter trial.

To the extent that defendant's motion sought an order for preservation of items admitted into evidence, or offered but excluded from evidence, in the capital trial, it was unnecessary. Such items are by law maintained as part of the record of a criminal proceeding. (Cal. Rules of Court, rules 39.5 (c), 33; see also § 1417.1, subd. (d); Gov. Code, § 69503, subd. (a).) Although the trial court may well have had the inherent power to issue an order for the preservation of those materials (see Code Civ. Proc., § 128, subd. (a)), its refusal to do so cannot have prejudiced defendant inasmuch as they were already part of the record.

Defendant also suggests that the trial court was required to issue the requested order in order to preserve his right to meaningful state and federal habeas review of his conviction and sentence. He cites no specific authority for this point, and we do not find it persuasive.

It follows, then, that because the trial court lacked jurisdiction to require preservation of investigative materials in the equivalent of postjudgment discovery proceedings, and because the other materials whose preservation defendant sought were already a part of the record, the trial court's order denying his motion did not affect his substantial rights. Under section 1237, subdivision (b), it cannot be appealed.

DISPOSITION

The judgment in No. S004778 is affirmed.

The purported appeal in No. S012228 is dismissed.

Lucas, C. J., Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.**—I concur in the judgment. After review, I agree with the majority that the judgment in No. S004778 (Crim. No. 26412) should be affirmed and that the appeal in No. S012228 should be dismissed.

I write separately to address at some length defendant's claim that the trial court erred by refusing to give the following instruction on his request: "It is appropriate for you to consider in mitigation any 'lingering doubts' you may have concerning defendant's guilt. Lingering doubt is defined as that state of mind between beyond a reasonable doubt and beyond all possible doubt."

The seminal case on "lingering doubt" is *People* v. *Terry* (1964) 61 Cal.2d 137 [37 Cal.Rptr. 605, 390 P.2d 381].

In that case, we held that the California death penalty law did not permit a capital defendant to "attack . . . the legality of the . . . adjudication" of guilt. (*People* v. *Terry, supra,* 61 Cal.2d at p. 145.) Our conclusion "rest[ed] upon the self-evident prohibition of any attempt to relitigate the . . . conviction." (*Ibid.*)

But we also held that the statutory scheme did indeed allow capital jurors to "conclude that the prosecution has discharged its burden of proving defendant's guilt beyond a reasonable doubt but . . . still demand a greater degree of certainty of guilt for the imposition of the death penalty." (*People* v. *Terry, supra,* 61 Cal.2d at pp. 145-146.) We explained: "The jury's task, like the historian's, must be to discover and evaluate events that have faded into the past, and no human can perform that function with certainty. Judges and juries must time and again reach decisions that are not free from doubt; only the most fatuous would claim the adjudication of guilt to be infallible. The lingering doubts of jurors in the guilt phase may well cast their shadows into the penalty phase and in some measure affect the nature of the punishment. Even were it desirable to insulate the psychological reactions of the jurors as to each trial, no legal dictum could compel such division, and, in any event, no statute designs it." (*Id.* at p. 146.)[1]

In the almost 30 years that have passed since we decided *Terry,* we have firmly adhered to its teaching. (See, e.g., *People* v. *Coleman* (1969) 71

---

[1]"Lingering doubt" cannot be dismissed as simply unreasonable and, hence, altogether empty. "There may be no *reasonable* doubt—doubt based upon reason—and yet some *genuine* doubt exists." (*Smith* v. *Balkcom* (5th Cir. 1981) 660 F.2d 573, 580, mod. on another point (1982) 671 F.2d 858, italics in original; accord, *Smith* v. *Wainwright* (11th Cir. 1984) 741 F.2d 1248, 1255.) Such a doubt must be allowed. As Professor Michael L. Radelet has observed: "The criterion for guilt, 'beyond a reasonable doubt,' is not the same as absolute certainty, and thus a small but nonzero proportion of all defendants convicted of homicide or sentenced to death will be innocent. Indeed, this contention is supported by historical research. Approximately 350 wrongful convictions for homicide, including approximately 100 involving the imposition of a death sentence upon a defendant who later was shown to be completely innocent, have been identified in the United States since 1900." (Radelet, *Rejecting the Jury: The Imposition of the Death Penalty in Florida* (1985) 18 U.C. Davis L.Rev. 1409, 1427.)

Cal.2d 1159, 1168 [80 Cal.Rptr. 920, 459 P.2d 248]; *People* v. *Haskett* (1982) 30 Cal.3d 841, 866 [180 Cal.Rptr. 640, 640 P.2d 776]; *People* v. *Thompson* (1988) 45 Cal.3d 86, 134-135 [246 Cal.Rptr. 245, 753 P.2d 37]; *People* v. *Cox* (1991) 53 Cal.3d 618, 675-679 [280 Cal.Rptr. 692, 809 P.2d 351]; *People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1238-1240 [9 Cal.Rptr.2d 628, 831 P.2d 1210].)

It might perhaps be argued that the California death penalty law, as it now stands, does not allow capital jurors to entertain, and act on, "lingering doubt."

Such an argument would prove unpersuasive. In pertinent part, the statutory scheme today is substantially similar to its predecessor at the time of *Terry*. Then, it provided: "Evidence may be presented at the . . . proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty." (Pen. Code, former § 190.1; Stats. 1959, ch. 738, § 1, pp. 2727-2728.) Today, it provides: "In the proceedings on the question of penalty, evidence may be presented . . . as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to, the nature and circumstances of the present offense, . . . and the defendant's character, background, history, mental condition and physical condition." (Pen. Code, § 190.3.) *Terry*'s reasoning is as applicable to the latter as to the former.

To be sure, in the years following *Terry*, the statutory scheme has experienced many changes. Most prominent for purposes here is the addition of a list of factors that the jury is required to "take into account," "if relevant," "[i]n determining penalty." (Pen. Code, § 190.3.) That list may indeed serve to structure the process whereby discretion is exercised. But it simply does not even purport to limit that discretion itself.[2] In *Terry*'s time, it appears, the choice of punishment turned on the defendant's personal moral culpability. That is also true today. (*People* v. *Gallego* (1990) 52 Cal.3d 115, 207 [276 Cal.Rptr. 679, 802 P.2d 169] (conc. opn. of Mosk, J.).)

As a general matter, whether or not to expressly instruct on "lingering doubt" must be entrusted to the trial court's discretion. An instruction of this

---

[2]No problem appears to arise in this regard under the United States Constitution. Certainly, "the [federal] constitutional prohibition on arbitrary and capricious capital sentencing determinations is not violated by a capital sentencing 'scheme' "—like California's—" 'that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by statute.' " (*California* v. *Ramos* (1983) 463 U.S. 992, 1009, fn. 22 [77 L.Ed.2d 1171, 1186, 103 S.Ct. 3446], quoting *Zant* v. *Stephens* (1983) 462 U.S. 862, 875 [77 L.Ed.2d 235, 248, 103 S.Ct. 2733].)

kind might, at one and the same time, offer a benefit and threaten a cost. That is to say, it might prevent capital jurors from laboring under any misconception in this regard. But it might also invite such jurors to decline the difficult task of assessing the defendant's personal moral culpability in favor of a kind of arbitrary and capricious "nondetermination" of penalty based on merest speculation. Whether the possible benefit is worth the potential cost depends on the peculiar facts of the individual case. It is the trial court that must make the determination in the first instance.

Under certain circumstances, however, the trial court is required to expressly instruct on "lingering doubt." As shown, the California death penalty law allows capital jurors, in determining penalty, to entertain, and act on, such doubt. The court is obligated to give an express instruction on the matter when there is a reasonable likelihood that, in the absence of such an advisement, the jury will labor under a misconception in this regard. A reasonable likelihood of this sort would compel a finding of error. (See generally *People* v. *Clair* (1992) 2 Cal.4th 629, 662-663 [7 Cal.Rptr.2d 564, 828 P.2d 705].) Error, of course, must be avoided.[3]

I now turn to the case at bar. As stated, defendant claims that the trial court erred by refusing his express instruction on "lingering doubt." The point proves to lack merit.

To begin with, the trial court was not required to expressly instruct on "lingering doubt."

"Lingering doubt," in defendant's own words, was one of his "most central themes" at the penalty phase. The People made no suggestion that such doubt was in any way immaterial.

Further, the trial court's charge did not preclude "lingering doubt." Quite the contrary. Specifically, it directed the jurors to consider certain factors in

---

[3]As is evident, the requirement to expressly instruct on "lingering doubt" arises from the California death penalty law. It does *not* arise from the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution or from the analogous clause of article I, section 17 of the California Constitution. (*People* v. *Cox, supra,* 53 Cal.3d at pp. 676-677 [dealing with both U.S. Const., Amend. VIII, and Cal. Const., art. I, § 17]; accord, *Franklin* v. *Lynaugh* (1988) 487 U.S. 164, 172-174 [101 L.Ed.2d 155, 164-165, 108 S.Ct. 2320] (plur. opn. by White, J.); *id.* at pp. 187-188 [101 L.Ed.2d at p. 174](conc. opn. of O'Connor, J.) [dealing with only U.S. Const., Amend. VIII].) This is because neither the federal nor the state constitutional provision *mandates* that capital jurors, in determining penalty, be allowed to entertain, and act on, "lingering doubt." (*People* v. *Cox, supra,* at pp. 676-677 [dealing with both U.S. Const., Amend. VIII, and Cal. Const., art. I, § 17]; accord, *Franklin* v. *Lynaugh, supra,* at pp. 172-174 (plur. opn. by White, J.); *id.* at pp. 187-188 (conc. opn. of O'Connor, J.) [dealing with only U.S. Const., Amend. VIII].)

determining penalty. One was "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding . . . ." This was broad enough to include "lingering doubt." Another factor was "[a]ny . . . circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." This too was broad enough to include "lingering doubt."[4]

In view of the foregoing, there was not a reasonable likelihood that, without an express instruction on "lingering doubt," the jury would labor under any misconception in this regard. (Compare *People* v. *Raley* (1992) 2 Cal.4th 870, 918-919 [8 Cal.Rptr.2d 678, 830 P.2d 712] [arriving at a similar conclusion on a similar record for similar reasons]; *People* v. *Price* (1991) 1 Cal.4th 324, 488-489 [3 Cal.Rptr.2d 106, 821 P.2d 610] [same]; *People* v. *Sully* (1991) 53 Cal.3d 1195, 1246 [283 Cal.Rptr. 144, 812 P.2d 163] [same].)

Because the trial court was not required to expressly instruct on "lingering doubt," it had discretion to do so or not. Its decision not to instruct cannot be deemed an abuse of discretion. Its implicit assessment that the possible benefit was not worth the potential cost was not unreasonable.

Accordingly, having found no basis for doing otherwise, I join the majority in affirming the judgment in No. S004778 (Crim. No. 26412) and in dismissing the appeal in No. S012228.

Kennard, J., concurred.

Appellant's petition for a rehearing was denied January 20, 1993.

---

[4]To my mind, the pattern instruction set out in CALJIC No. 8.85 (5th ed. 1988 bound vol.)—which *is* substantially similar to the charge quoted above—is "inclusive" of "lingering doubt."